**THE ROSEN LAW FIRM, P.A.**
Laurence Rosen
One Gateway Center, Suite 2600
Newark, NJ 07102
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

Yu Shi (admitted *Pro Hac Vice*)
275 Madison Ave, 40th Floor
New York, NY 10016
Tel: (212) 686-1060
Fax: (212) 202-3827
Email: yshi@rosenlegal.com

*Lead Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE ELECTRIC LAST MILE SOLUTIONS, INC. SECURITIES LITIGATION | Case No. 2:22-cv-00545-CCC-LDW **AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** JURY TRIAL DEMANDED |

Lead Plaintiff Jun Zheng and named plaintiff Scott T. Hacker ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' amended complaint against Defendants (defined below), allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters,

based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, (a) review and analysis of Defendants' public documents, conference calls, and announcement; (b) review and analysis of public filings, wire and press releases published by and regarding Electric Last Mile Solutions, Inc. ("ELMS" or the "Company"); (c) review and analysis of information readily obtainable on the internet; and (d) discussions with an accounting expert. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a class action on behalf of persons or entities who: (1) purchased the publicly-traded common stock of ELMS from June 9, 2021 to February 1, 2022, both dates inclusive (the "Class Period"),[1] seeking to recover compensable damages caused by Defendants' violations of the federal securities laws under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"); and/or (2) held common stock of FIII (defined below) as of June 24, 2021, eligible to vote at FIII's special meeting, seeking to pursue remedies under Section 14(a) of the Exchange Act.

---

[1] Prior to June 25, 2021, ELMS was known as Forum Merger III Corporation and its common stock traded under the ticker symbol "FIII".

2

2.     ELMS was formed on June 25, 2021 as the result of a "de-SPAC" transaction between its predecessor Forum Merger III Corporation ("FIII") and Electric Last Mile, Inc. ("ELM").

3.     FIII was a special purpose acquisition company ("SPAC"), also known as a blank-check company, that Defendant Marshall Kiev created with the sole purpose of finding and merging with a privately-held company to enable the private company to go public without the burdens of a traditional initial public offering. The merger between a SPAC and the privately-held company is known as a de-SPAC transaction.

4.     Once a SPAC is formed, it immediately faces great pressure to find a target company for merger, because if a SPAC does not merge with a target company within two years after a SPAC becomes public and raises money from public investors, then the SPAC must return funds to its public investors and dissolve.  FIII became publicly-traded and raised funds from public investors on August 21, 2020, so it faced an August 21, 2022 deadline to complete a merger with a target company.

5.     FIII quickly identified ELM as a target company with which to merge. On September 18, 2020 – less than a month after FIII went public – FIII executed a letter of intent to merge with ELM.  After the merger, the combined company would be known as ELMS. According to the letter of intent, the estimated enterprise value

of the combined company was $1.3 billion. Following the merger, each share of ELM common stock would be exchanged for 821.17 shares of ELMS common stock.

6.     ELM was itself a new company, created in August 2020 by Defendants Jason Luo and James Taylor to manufacture electric vans and utility vehicles used to make "last mile" deliveries.

7.     On November 19, 2020, after the letter of intent had been signed and knowing that ELM would soon go public via the merger with FIII, Defendants Luo and Taylor caused ELM to issue 99,000 shares of ELM common stock to entities owned by Defendants Luo and Taylor, as well as to four unidentified investors, for $10 per share – a price that was approximately $8,200 per share below fair market value (the "November 2020 Equity Transaction").

8.     Of the 99,000 ELM shares issued in the November 2020 Equity Transaction, 78,016 shares were sold to entities owned and controlled by Defendant Luo, 6,461 shares were sold to entities owned and controlled by Defendant Taylor, and 14,523 shares were sold to the four unidentified investors.

9.     Then, a month later, on December 8, 2020, Defendant Luo sold 1,000 shares of ELM common stock also at $10 per share to an entity owned and controlled by ELM's Chief Operating Office Hailiang (Jerry) Hu and ELM's General Counsel Benjamin Wu (the "December 2020 Equity Transaction").

4

10.     Under Generally Accepted Accounting Principles ("GAAP"), ELM was required to perform a valuation to estimate the fair market value of the shares that were sold in the November 2020 Equity Transaction and December 2020 Equity Transaction to ELM's senior executives, and record as compensation expense the difference between (a) the fair market value of ELM shares, and (b) the $10 per share that was paid.  This was not done.

11.     The failure to record compensation expenses stemming from the November 2020 Equity Transaction and December 2020 Equity Transaction had the effect of substantially inflating ELM's year-end 2020 financial performance and the pro forma year-end 2020 financial performance of the combined company (*i.e.,* ELMS), understating expenses, net loss, and shareholders' deficit by over $700 million or from 1,000% to over 10,000%.

12.     The false financials were included in the proxy statement that FIII issued on June 9, 2021, ahead of the June 24, 2021 special meeting of FIII shareholders to solicit votes on approving the merger with ELM ("Proxy Statement"), as well as in the F-1 that ELMS filed with the SEC on July 23, 2021 and the F-1/A filed on July 30, 2021 (the F-1 and F-1/A are together the "Registration Statement").

13.     The truth was revealed on February 1, 2022, when ELMS filed a Form 8-K with the SEC after the close of trading, disclosing that an independent

investigation had discovered that Defendants Luo, Taylor, and other members of ELM senior management had acquired ELM shares at "substantial discounts to market value" in the November 2020 Equity Transaction and the December 2020 Equity Transaction, and that the difference between the fair market value and the amount actually paid (*i.e.* $10) should have been, but was not, recorded as compensation.  As a result, ELM's 2020 financial statements would need to be restated.

14.    This adverse disclosure on February 1, 20202 shocked the market. ELMS' share price fell $2.88 per share, or 51%, to close at $2.71 per share on February 2, 2022, on unusually heavy trading volume, damaging investors.

## **JURISDICTION AND VENUE**

15.    The claims asserted herein arise under and pursuant to Sections 10(b), 14(a) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rules 10b-5 and 14a-9 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5, 17 C.F.R. § 240.14a-9).

16.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

17.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged

misstatements entered and the subsequent damages took place in this judicial district.

18.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## **PARTIES AND RELEVANT NON-PARTIES**

### *Plaintiffs*

19.     Lead Plaintiff Jun Zheng, as set forth in his certification previously filed with the Court and incorporated by reference herein, purchased the publicly traded common stock of ELMS at artificially inflated prices during the Class Period.

20.     Named plaintiff Scott T. Hacker, as set forth in his certification previously filed with the Court and incorporated by referenced herein, purchased publicly traded common stock of ELMS at artificially inflated prices during the Class Period.  Mr. Hacker also held FIII shares as of June 24, 2021 and was eligible to vote in FIII's special meeting held on June 24, 2021.

### *Relevant Non-Parties*

21.     Non-party ELMS was an electric vehicles company that purported to manufacture electric vans and utility vehicles used for making "last mile" deliveries.

ELMS was formed on June 25, 2021 as a result of a merger between FIII and ELM (the "Business Combination"). During the Class Period, ELMS' common stock traded on NASDAQ under the ticker symbol "ELMS." On June 14, 2022, ELMS filed for Chapter 7 liquidation bankruptcy.

22.     Non-party FIII was the predecessor of ELMS. FIII was incorporated as a blank check company on June 25, 2019 for the sole purpose of effecting a merger with a private company seeking to go public. On August 21, 2020, FIII became a publicly-traded company. Prior to the Business Combination, FIII's common stock traded on NASDAQ under the ticker symbol "FIII." Following the Business Combination on June 25, 2021, FIII changed its name to ELMS and its ticker symbol to "ELMS."

23.     Non-party ELM was an electric vehicles manufacturing company based in Michigan. ELM was co-founded on August 20, 2020 by Defendants Jason Luo and James Taylor. ELM merged with FIII on June 25, 2021, forming ELMS.

*Defendants*

24.     Defendant Jason Luo ("Luo") served as ELMS' Executive Chairman and Chairman of ELMS' Board of Directors following the Business Combination until February 1, 2022, when he was forced to resign from those positions (discussed in greater detail below). Prior to the Business Combination, Defendant Luo was ELM's co-founder, President, and Executive Chairman.

25.     Defendant James Taylor ("Taylor") served as ELMS' Chief Executive Officer ("CEO") and was a member of ELMS' Board of Directors following the Business Combination until February 1, 2022, when he was forced to resign from those positions (discussed in greater detail below). Prior to the Business Combination, Defendant Taylor was ELM's co-founder and CEO.

26.     Defendant Marshall Kiev ("Kiev") served as Co-Chief Executive Officer ("CEO"), President, and as a Director at FIII. Defendant Kiev was the managing member of Forum Capital Management III LLC ("Sponsor Managing Member"), which controlled Forum Investors III LLC ("Forum III" or "Sponsor"), the sponsor of FIII.[2]

27.     Defendant David Boris ("Boris") served as Co-CEO, Chief Financial Officer ("CFO"), and as a Director at FIII.  After the Business Combination, he continued to serve as a Director of ELMS.

28.     Defendant Albert Li ("Li") served as ELMS' CFO and Treasurer from the Business Combination to November 2021. Prior to the Business Combination, Defendant Li served as CFO and Treasurer at ELM since its inception.

---

[2] Forum Capital Management III LLC and Forum Investors III LLC were both dissolved in July 2022 and no longer exist.

29.     Defendant BDO USA, LLP ("BDO") is a professional services firm that provides accounting, tax, and consulting services. BDO served as ELM's auditor since the latter's inception. BDO audited ELM's financial statements for the period from August 20, 2020 (ELM's inception) to December 31, 2020.  On July 13, 2021, following the Business Combination, BDO became the auditor of ELMS. BDO remained ELMS' auditor until its resignation on February 8, 2022.

30.     Defendants Luo, Taylor, Kiev, Boris, and Li are collectively referred to herein as the "Individual Defendants."

31.     The Individual Defendants and BDO are collectively referred to herein as "Defendants."

## DETAILED ALLEGATIONS OF MISCONDUCT

### *Background: FIII Merged with ELM and Became ELMS*

32.     FIII was incorporated on June 25, 2019 as a blank check company, commonly known as a SPAC, for the purpose of finding and merging with a private company that would like to become a publicly-traded company without going through a traditional IPO, as IPOs are expensive, burdensome, and time-consuming.

33.     On August 21, 2020, FIII – up to then still a blank check company – completed its IPO and became publicly traded, raising $250 million from public investors. FIII held those funds in a trust for investors while it sought a target company to merge with and take public.

34.     FIII had two years (*i.e.,* until August 21, 2022) to identify and merge with a company. If FIII failed to do so during the two-year period, it would have to return the funds that it held in trust to its public investors and dissolve. As such, FIII was highly motivated to quickly find a target company and effectuate a merger.

35.     FIII did just that. Less than a month later, on September 18, 2020, FIII announced that it had executed a letter of intent to merge with ELM.  FIII and ELM estimated the value of the combined company to be $1.3 billion as of September 18, 2020.

36.     ELM was a fledgling Michigan-based company that purported to manufacture electric vans and utility vehicles for last-mile deliveries.  Defendants Luo and Taylor co-founded ELM in August 2020, with Defendant Luo serving as ELM's President and Executive Chairman, and Defendant Taylor as CEO.

37.     At the time that FIII and ELM executed the letter of intent for their proposed business combination on September 18, 2020, Defendant Luo owned 100% of ELM through an entity known as AJ Capital, Inc. ("AJ Capital"), which Defendant Luo owned and controlled.[3]

38.     The proposed business combination moved along quickly. On December 11, 2020, FIII announced that it and ELM had executed a definitive

_____

[3] ELM issued 1,000 shares of common stock to AJ Capital on September 11, 2020.

merger agreement, subject to approval by their respective shareholders.

39.     On June 25, 2021, following a special meeting held on June 24, 2021 during which FIII shareholders voted to approve the merger, FIII and ELM consummated their merger (the "Business Combination"). Following the Business Combination, FIII changed its name to ELMS, and changed the ticker symbol for FIII common stock to "ELMS." Each share of ELM common stock was exchanged for 821.17 shares of ELMS common stock.

***The November 2020 Equity Transaction***

40.     On November 19, 2020, two months after the letter of intent for the Business Combination was executed and one month before ELM and FIII were to sign the definitive merger agreement, Defendant Luo and Taylor caused ELM to issue and sell 99,000 shares of common stock to seven "investors" at a price of $10 per share.

41.     Three of the seven "investors" that acquired ELM common stock in the November 2020 Equity Transaction were entities owned and controlled by Defendants Luo and Taylor themselves.

42.     Specifically, 58,016 shares were sold to AJ Capital Investments. LCC ("AJ Capital Investments"), and 20,000 shares were sold to Luo Pan Investment II, LLC ("Luo Pan").  Both AJ Capital Investments and Luo Pan were entities owned and controlled by Defendant Luo.

43.     The JET Group LLC, an entity owned and controlled by Defendant Taylor, purchased 6,461 shares in the November 2020 Equity Transaction.

44.     The remaining 14,523 shares were sold to four unidentified investors.

45.     Below is a summary of the ELM shares acquired in the November 2020 Equity Transaction:

Entities Owned and Controlled by Defendant Luo
     AJ Capital Investment, LLC    58,016 shares
     Luo Pan Investment II, LLC    20,000 shares
                              78,016 shares

Entities Owned and Controlled by Defendant Taylor
     The JET Group, LLC    6,461 shares

Total Shares Acquired by Entities
Owned and Controlled by
Defendants Luo and Taylor    84,477 shares

Four Other Unidentified Investors    14,523 shares

     Total    99,000 shares

**The December 2020 Equity Transaction**

46.     On December 8, 2020, three days before the definitive merger agreement for the Business Combination was executed, Defendant Luo, through AJ Capital, sold 1,000 shares of ELM common stock at $10 per share to 456 Investments LLC ("456 Investments"), an entity jointly owned and controlled by ELM's Chief Operating Officer Hailiang (Jerry) Hu ("Hu") and ELM's General

Counsel Benjamin Wu ("Wu").[4]

***GAAP Rules Relevant to the November and December 2020 Equity Transactions***

47.    GAAP constitutes standards recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices, and is the common set of accounting principles, standards, and procedures that companies in the U.S. use to prepare their financial statements.

48.    The U.S. Securities and Exchange Commission ("SEC") has the statutory authority for the promulgation of GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board ("FASB"). The FASB Accounting Standards Codification ("ASC"), along with SEC rules and interpretive releases, represent sources of authoritative GAAP for companies in the U.S.

49.    Regulation S-X, 17 C.F.R. § 210.4-01(a)(1), states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.

50.    ASC 718 governs accounting for share-based transactions with employees and non-employees.  Under ASC 718, when shares are issued or sold to

---

[4] These were the 1,000 shares of ELM common stock that ELM issued to AJ Capital on September 11, 2020.

14

persons providing services to the company, the company is required to recognize as compensation expense the difference between: (a) the fair market value of the shares issued or sold to the persons or entities providing services, and (b) the price paid for those shares by the recipient.

51.   ASC 718 requires compensation expense to be based on the value of the compensation awards at grant date. (ASC 718-10-30-6).  Therefore, companies should be frequently and contemporaneously valuing their stock when awarding stock-based compensation. ASC 718 acknowledges that it should be possible to reasonably estimate the fair value of most equity instruments at the date they are granted. (ASC 718-10-30-21). ASC 718 instructs clearly that an entity should determine fair value based upon all expectations and information available on the grant date. (ASC 718-10-55-13).

52.   In addition to grants by the company, employees may earn awards granted by other parties. To determine which awards are subject to ASC 718, companies must consider awards granted by holders of an economic interest, which includes any person or entity that has a financial interest in the company. Under ASC 718-10-15-4, if a related party or other economic interest holder of the company grants an employee of the company an instrument that falls within the scope of ASC 718, that transaction should also be accounted for by the company as stock-based compensation.  Thus, Defendant Luo was required to disclose the ELM shares he

sold to COO Hu and General Counsel Wu in November 2020, and ELM was required to record the difference in fair market value as compensation expense.

53.    Concerning the November 2020 Equity Transaction, the Proxy Statement and the Registration Statement disclosed only that: "On November 19, 2020, ELM issued an additional 84,477 shares of common stock, in the aggregate, to two entities controlled by one of the founders of ELM (Jason Luo) and a third entity controlled by the other founder of ELM (James Taylor) for $10 per share."

54.    In violation of GAAP, the financial statements included in the Proxy Statement and the Registration Statement failed to account for the November 2020 Equity Transaction.  The Proxy Statement and the Registration Statement failed to measure and record as compensation expense the difference between: (a) the fair market value of the shares of ELM common stock sold to the entities owned and controlled by Defendants Luo and Taylor as of November 19, 2020, and (b) the $10 per share that those entities paid or cause to be paid.

55.    The December 2020 Equity Transaction was not disclosed at all in the Proxy Statement or the Registration Statement.

56.    GAAP recognizes that if a related party or other economic interest holder of the company (*e.g.,* an investor) grants stock to an employee of the company, that transaction should be accounted for by the company as stock-based compensation.

57.     The substance of the transaction is that the investor is making a capital contribution to the company, and the company, in turn, is making a share-based payment to its employee in exchange for services.  Thus, the company is required to record a capital contribution from the investor and compensation cost for the value of the shares transferred to the employee, net of payment received from the employee. (ASC 718-10-15-4).

58.     In other words, ELM's financial statements for the period ended December 31, 2020 should have recorded a capital contribution by AJ Capital, and measured and recorded as compensation expense for Hu and Wu the difference between (a) the fair market value of the shares sold to 456 Investments as of December 8, 2020, and (b) the $10 per share that 456 Investments paid.

***The Financial Statements Included in the Proxy Statement and Registration Statement Were False and Misleading***

59.     On June 9, 2021, FIII issued the Proxy Statement to solicit shareholders to vote at the June 24, 2021 special meeting regarding whether to approve the Business Combination. The Proxy Statement contained ELM's financial results for the period August 20, 2020 to December 31, 2020, as well as pro forma financial results for the combined company for the year ended December 31, 2020.

60.     Defendants Kiev and Boris each signed the Proxy Statement.

61.     On July 23, 2021, a month after the consummation of the Business Combination, ELMS filed a registration statement with the SEC on Form 1-A to

register ELMS stock held by company insiders so that they may sell those shares. An amended registration statement on Form F-1/A was filed on July 30, 2021. The Registration Statement contained ELM's financial results for the period August 20, 2020 to December 31, 2020, as well as pro forma financial results for the combined company for the year ended December 31, 2020.

62.     Defendants Luo, Taylor, Boris, and Li each signed the Registration Statement.

63.     The most reasonable estimate for the value of ELM common stock in November 2020 and December 2020 was $8,211.70 per share. In an investor presentation attached to FIII's Form 8-K filed on December 11, 2020, the estimated equity value of the combined company was approximately $1.4 billion as of December 2020, at a share price of $10 per share.[5] Applying the exchange ratio of 821.17 shares of ELMS common stock for 1 share of ELM common stock results in ELM common stock being valued at $8,211.70 per share at the time of the November and December 2020 Equity Transactions.[6]  This means that the 84,477 shares of ELM common stock purchased by Defendants Luo and Taylor through the entities

_____

[5] This is also reasonable estimate for November 19, 2020, because the value of the combined company was already estimated to be $1.3 billion as of September 2020.
[6] 1 ELM share = 821.17 ELMS shares. Each ELMS share was valued at $10, so 1 ELM share = 821.17 * $10 = $8,211.70.

that they owned and controlled in the November 2020 Equity Transaction, and the 1,000 shares purchased by Hu and Wu through 456 Investments in the December 2020 Equity Transaction, were purchased at a steep discount of $8,201.70 per share. This difference between fair market value and price actually paid for was required to be disclosed and recorded as compensation expense.

64.     As explained above, the difference between the estimated fair market value of ELM common stock and the $10 per share that the recipients in the November and December 2020 Equity Transactions paid was $8,201.70 per share. Hence, ELM's 2020 financials understated compensation expense, and thus, net loss, by $701,05,711 (*i.e.* $8,201.70 per share * 85,477 shares issued in total to entities controlled by Defendant Luo, Defendant Taylor, Hu, and Wu in the November and December 2020 Equity Transactions).

65.     The following charts summarize the items misstated in the financials included in the Proxy Statement and the Registration Statement, as well as the magnitude of the misstatement.

**Registration Statement:**

| ELM – 8/20/20 to 12/31/20 | | | | |
|---|---|---|---|---|
| **Item** | **Originally Stated** | **Correct Amount** | **$ Understated** | **% Understated** |
| Total Operating Expenses (and Operating Loss) | $7,633,994 | $708,690,705 | $701,056,711 | 9183% |
| Net Loss | $7,728,437 | $708,785,148 | $701,056,711 | 9071% |
| Shareholders' Deficit | $6,728,437 | $707,785,148 | $701,056,711 | 10419% |

| Combined Pro Forma – year ended 12/31/20 | | | | |
|---|---|---|---|---|
| **Item** | **Originally Stated** | **Correct Amount** | **$ Understated** | **% Understated** |
| Total Operating Expenses (and Operating Loss) | $38,140,439 | $739,197,150 | $701,056,711 | 1838% |
| Net Loss | $65,408,109 | $766,464,820 | $701,056,711 | 1071% |

**Proxy Statement:**

| ELM – 8/20/20 to 12/31/20 | | | | |
|---|---|---|---|---|
| **Item** | **Originally Stated** | **Correct Amount** | **$ Understated** | **% Understated** |
| Total Operating Expenses (and Operating Loss) | $7,633,994 | $708,690,705 | $701,056,711 | 9183% |
| Net Loss | $7,728,437 | $708,785,148 | $701,056,711 | 9071% |
| Shareholders' Deficit | $6,728,437 | $707,785,148 | $701,056,711 | 10419% |
| **Combined Pro Forma – year ended 12/31/20** | | | | |
| **Item** | **Originally Stated** | **Correct Amount** | **$ Understated** | **% Understated** |
| Total Operating Expenses (and Operating Loss) | $37,925,416 | $738,982,127 | $701,056,711 | 1848% |
| Net Loss | $65,843,173 | $766,899,884 | $701,056,711 | 1064% |

## **THE TRUTH IS REVEALED**

66.     On February 1, 2022, after the close of trading, ELMS filed a Form 8-K (the "February 2022 8-K") with the SEC. In the February 2022 8-K, ELMS disclosed that following an independent investigation, ELMS had determined that Defendants Luo, Taylor, and other senior members of ELM's management had acquired ELM common stock at "substantial discounts to market value" in the November 2020 Equity Transaction and the December 2020 Equity Transaction. The February 2022 8-K further disclosed that the difference between the fair market value of the ELM common stock sold in the November and December 2020 Transactions and the amount actually paid (*i.e.* $10 per share) was not properly recorded as compensation expense. The February 2022 8-K also provided additional details concerning the November 2020 Equity Transaction, and disclosed for the first time the existence of the December 2020 Equity Transaction.

67.     As a result of the failure to properly treat the November 2020 Equity Transaction and the December 2020 Equity Transaction as compensation, the February 2022 8-K stated that ELM's financial statements for the period from August 20, 2020 to December 31, 2022 included in the Registration Statement would need to be restated.[7]  ELMS also disclosed that ELMS' financial statements for the

---

[7] The same financial statement was included in the Proxy Statement.

six months ended June 30, 2021 included in its Form 10-Q filed with the SEC on August 13, 2021, and its financial statements for the nine months ended September 30, 2021 included in its Form 10-Q filed with the SEC on November 12, 2021 should no longer be relied upon.[8]

68.     The adverse disclosure in the 2022 February 8-K shocked the market. The share price of ELMS common stock fell by $2.88 per share, or 51%, to close at $2.71 per share on February 2, 2022, on unusually heavy trading volume, damaging investors.

**ADDITIONAL ALLEGATIONS SUPPORTING SCIENTER**

69.     The swift and severe punishment levied on Defendants Luo and Taylor for their role in the November 2020 and December 2020 Equity Transactions provide strong evidence that their actions were not mere innocent mistakes.  Indeed, upon learning of their self-dealing and accounting fraud, the Board of Directors immediately fired both Defendant Luo and Taylor from all their positions at ELMS as of February 1, 2022.  In a settlement agreement between Defendant Luo and ELMS, Luo also agreed to surrender 6 million shares of ELMS common stock back to the company, and pay an additional $10 million (in cash and stock) to ELMS.

---

[8] ELMS filed for Chapter 7 bankruptcy before any restatement was issued. Hence no restatement was ever filed.

Similarly, Defendant Taylor's settlement agreement called for him to surrender 1.8 million shares of ELMS common stock, and pay an additional $3.3 million (in cash and stock) to ELMS.  The severe punishment levied on Defendants Luo and Taylor indicate that their misconduct was intentional.

70.    ELMS would not have forced out Defendants Luo and Taylor if their misconduct was nothing more than a careless oversight. Both the Proxy Statement and the Registration Statement stated that "Except for Messrs. Luo and Taylor, none of our executive officers have direct experience in the management of a publicly traded company." Defendants Luo and Taylor were critical to the success of the company given their significant experience and background in the automotive industry. FIII's investor presentation included in its December 11, 2020 Form 8-K also touted ELM's management led by Defendants Luo and Taylor as "world class" and a key strength of the combined company. Moreover, Defendant Luo's connections in China were instrumental to ELMS, who would be relying on suppliers and contractors from China to manufacture its vehicles.

71.    The February 2022 8-K also indicated that Defendants Luo and Taylor lied to the special committee during the course of its investigation, stating that "in connection with the Special Committee investigation, Messrs. Luo and Taylor provided responses to the Special Committee that are believed to be inconsistent with documents reviewed by the Special Committee and its counsel." The only

credible inference is that they lied because they knew they had engaged in intentional wrongdoing.

72.     Defendants Kiev and Boris, as senior members of the SPAC, were highly motivated to consummate the Business Combination. If the Proxy Statement had shown that ELM's net loss was actually almost 10,000% higher than what was stated, FIII shareholders would have been less inclined to vote for the Business Combination, or they have might sought to redeem their shares instead.[9] Failure to obtain shareholder approval for the Business Combination would have been disastrous for FIII. Indeed, Defendants Kiev and Boris would have lost their entire investment in FIII if a business combination was not consummated by August 21, 2022.

73.     On the other hand, Defendant Kiev stood to profit handsomely if the Business Combination was consummated.  The Sponsor Managing Member, which Defendant Kiev controlled, paid just $25,000 for 6,250,000 founder shares, which if unrestricted and freely tradable, would be valued at approximately $63,687,500 at the time of the Business Combination based on ELMS' trading price of $10.19 per share on June 25, 2021.  Thus, even if ELMS' stock were to crash to $1.00 per share

_____

[9] According to the Proxy Statement, public shareholders of FIII had until June 22, 2021 to redeem their shares for $10 per share, essentially getting their money back.

after the Business Combination and public shareholders lost approximately 90% of their investment, the Sponsor Managing Member could nevertheless rake in a profit of more than $6 million.

74.     Therefore, even though both Defendants Kiev and Boris knew, prior to the Business Combination, that Defendants Luo and Taylor had acquired 85,477 shares of ELM common stock in the November 2020 Equity Transaction (*e.g.* the Proxy Statement, which Defendants Kiev and Boris signed, stated that entities controlled by Luo and Taylor purchased 85,477 shares of ELM common stock at $10 per share on November 19, 2020), neither of them bothered to probe this point, even though Defendants Kiev and Boris claimed to have conducted due diligence on ELM prior to recommending the Business Combination. They had every incentive to turn a blind eye to anything that might make the books look bad to investors and cause investors to vote against the Business Combination.

75.     Furthermore, on March 11, 2022, ELMS announced that the SEC had launched an investigation into the November and December 2020 Equity Transactions and the associated accounting violations.  It is unlikely that the SEC would have chosen to open this investigation and devote resources to it if it looked like all that happened were simply innocent mistakes.

## **BDO IS LIABLE**

76.     BDO provided a "clean" audit opinion on ELM's 2020 financial

statements, and in doing so, represented that it conducted its audit in accordance with the standard of the Public Company Accounting Oversight Board ("PCAOB").[10] In actuality, BDO failed to comply with the PCAOB's independence requirements and violated PCAOB auditing standards during its audit of ELM.

77.     PCAOB Rule 3520 requires a registered public accounting firm and its associated persons to be independent of the firm's audit client throughout the audit and professional engagement period. Additionally, PCAOB Rule 3526 requires a registered public accounting firm to describe to the audit committee of the potential audit client in writing "all relationships between the registered public accounting firm or any affiliates of the firm and the potential audit client or persons in financial reporting oversight roles at the potential audit client that, as of the date of the communication, may reasonably be thought to bear on independence." This written communication must be made prior to accepting an audit assignment, and also at least once a year after that.

78.     According to ELMS, during the course of its investigation of the November and December 2020 Equity Transactions, ELMS' special committee "identified that BDO's Tax Advisory Group ("BDO Tax") had helped to create and

---

[10] BDO's audit opinion, dated May 6, 2021, was included in the Registration Statement.

structure the [November 2020 and December 2020 Equity] Transactions that ultimately resulted in the resignations of [Defendants Luo and Taylor]."

79.    In a letter from ELMS to BDO dated February 9, 2022, ELMS stated that "To the extent that you claim that you were only recently made aware of the equity transactions described in the Form 8-K, ***we remind you that BDO Tax was involved in structuring such transactions and that, as you have confirmed to us, BDO USA was aware of those transactions well in advance of and in connection with completion of the audit. The transactions were contemporaneously discussed with multiple professional advisors, including representatives of BDO***." (emphasis added).

80.    BDO refuted ELMS' contention, responding in a letter to ELMS that: "BDO does not have a group named the "Tax Advisory Group", BDO did not help create and structure the Transactions nor does BDO have any basis of knowing what facts or circumstances resulted in the resignations of Mr. Luo or Mr. Taylor[.]"

81.    BDO's refutation is unconvincing and appears to be based on semantics.  BDO is a full-service accounting firm that, according to its website, "delivers assurance, tax, and financial advisory services to clients throughout the country and around the globe." Thus, even if BDO does not have a practice precisely named "Tax Advisory Group," that does not mean BDO does not provide tax advisory services. Indeed, its website shows that BDO has a tax practice comprised

of numerous professionals.

82.     Moreover, while BDO denied that it helped to "create and structure" the November and December 2020 Equity Transactions, it did not dispute that BDO provided services and advice to Defendant Luo and his affiliates, or that BDO was aware of the November and December 2020 Equity Transactions.

83.     ELMS also stated that it did not receive written communications from BDO providing analysis in support of BDO's independence determination despite BDO having provided advice to Defendants Luo and his affiliates.  This violates PCAOB Rule 3526.

84.     Not only did BDO violate PCAOB rules regarding independence, BDO also failed to properly perform appropriate audit procedures in response to known and significant risks that were present in its audit of ELM's 2020 financial statements. Instead, as discussed below, BDO ignored those risks and red flags.

85.     According to PCAOB audit standards (AS), an auditor is required to identify and appropriately assess the risks of material misstatement, including fraud risk, to be able to develop appropriate responses to these risks. (AS 2110.04, AS 2110.65). This includes assessing the risks of material misstatement associated with related parties and relationships and transactions with related parties, including whether the company has properly identified, accounted for, and disclosed its related parties and relationships and transactions with related parties. (AS 2410.10).

86.     PCAOB auditing standards specifically require auditor to assess the risk of material misstatement associated with transactions with executive officers of the company:

> "To assist in obtaining information for identifying and assessing risks of material misstatement of the financial statements associated with a company's financial relationships and transactions with its **executive officers** (*e.g.*, executive compensation, including perquisites, and any other arrangements), the auditor should perform procedures to obtain an understanding of the company's financial relationships and transactions with its executive officers. The procedures should be designed to identify risks of material misstatement and should include, but not be limited to (1) reading the employment and compensation contracts between the company and its executive officers and (2) reading the proxy statements and other relevant company filings with the Securities and Exchange Commission and other regulatory agencies that relate to the company's financial relationships and transactions with its executive officers." [Emphasis in Original.] (AS 2110.10A)

87.     BDO itself publishes a guide titled "BDO Knows: Going Public" that lists share-based compensation as one of nine high risk areas:

SHARE-BASED COMPENSATION

Registrants are required to measure and report all share-based compensation at fair market value. The calculations necessary to measure this compensation include assumptions about the company's share price volatility, interest rates, future dividends, and option life. As a result, many registrants are using appraisal advisors to calculate the value of the stock compensation grants.

88.     The BDO guide also highlights issuance of cheap stock as one of the issues to look out for with regards to companies going public:

Cheap stock - common stock sold before a public offering at a price which is less than the public offering price. Often, the stock is sold to company insiders.

89.     BDO was engaged to audit ELM's 2020 financial statements in February 2021. By that time, ELM and FIII had already executed its merger agreement for the Business Combination.  Thus, BDO knew, at the time it audited ELM's 2020 financial statements, that ELM planned to go public through a de-SPAC transaction with FIII, and should have identified share-based compensation and potential issuance of the company stock to company insiders as a significant risk requiring appropriate audit response.

90.     As indicated above in Paragraph 79, BDO was aware of the November and December 2020 Equity Transactions.  Indeed, BDO could not have been unaware of the November 2020 Equity Transaction because the financial statements section of the Registration Statement stated:

> On November 19, 2020, ELM issued an additional 84,477 shares of common stock, in the aggregate, to two entities controlled by one of the founders of ELM (Jason Luo) and a third entity controlled by the other founder of ELM (James Taylor) for $10 per share.

91.     Thus, in accordance with PCAOB audit standards, BDO should have assessed as significant risk ELM's 2020 financial statements associated with share-based awards to ELM's executives.  PCAOB standards required BDO to develop appropriate audit procedures, including tests of details, to respond to this risk.  Such procedures would have entailed examining ELM's stock ledgers and ensuring that

it accounted for share-based transactions in accordance with GAAP by measuring and reporting all share-based compensation at fair market value.[11]

92.    Had BDO performed such procedures, it would have discovered that ELM's 2020 financial statements were materially understated compensation expense as a result of ELM's failure to properly account for the issuance of stock in the November and December 2020 Equity Transactions. Indeed, it would be impossible for BDO to audit ELM's accounting for share-based awards without inquiring about and requesting ELM to provide BDO with valuations of ELM's stock performed in connection with the November and December 2020 Equity

---

[11] "The auditor must design and implement audit responses that address the identified and assessed risks of material misstatement." (AS 2301.3)  "The auditor should design and perform audit procedures in a manner that addresses the assessed risks of material misstatement for each relevant assertion of each significant account and disclosure.  In designing the audit procedures to be performed, the auditor should … [t]ake into account the types of potential misstatements that could result from the identified risks and the likelihood and magnitude of potential misstatement." (AS 2301.08 - .09)  For significant risks (*i.e.,* risks requiring special audit consideration, including fraud risks) the auditor should perform substantive procedures, including tests of details, that are specifically responsive to the assessed risks. (AS 2110.70 - .71, AS 2301.11, .13, .36)  The auditor must design and perform audit procedures in a manner that addresses the risks of material misstatement associated with related parties and relationships and transactions with related parties. (AS 2410.11)  Also, "the auditor must evaluate whether related party transactions have been properly accounted for and disclosed in the financial statements. This includes evaluating whether the financial statements contain the information regarding relationships and transactions with related parties essential for a fair presentation in conformity with the applicable financial reporting framework." (AS 2410.17)

Transactions. Such inquiries would have made BDO aware that ELM had not performed valuations of ELM's stock, thus requiring an appropriate audit response to the risk that ELM's share-based awards were recorded improperly.

93.     Thus, contrary to the representation contained in its audit opinion, BDO failed to perform an audit of ELM's 2020 financial statements in accordance with PCAOB standards and, therefore, did not have any reasonable basis to express an unqualified (*i.e.,* clean) opinion on ELM's 2020 financial statements. PCAOB standards required BDO to either decline to issue an opinion on ELM's 2020 financial statements or express an adverse opinion thereon.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

94.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons or entities who: (1) purchased the publicly-traded common stock of ELMS from June 9, 2021 to February 1, 2022, both dates inclusive (the "Class Period"), seeking to recover compensable damages caused by Defendants' violations of the federal securities laws under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"); and/or (2) held common stock of FIII as of June 24,

2021, eligible to vote at FIII's special meeting, seeking to pursue remedies under Section 14(a) of the Exchange Act.[12]

95.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, ELMS common stock was actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiff believe that there are hundreds, if not thousands of members in the proposed Class.

96.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

97.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

---

[12] Excluded from the Class are: (a) Defendants, the officers and directors of ELMS (including its predecessor FIII), ELM, and BDO, members of the Individual Defendants' immediate families and their legal representatives, heirs, and successors, and any entity in which any of the Defendants, or any person excluded under this subsection (a), has or had a majority ownership interest at any time; and (b) persons and entities who suffered no compensable losses.

98.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of ELMS;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused ELMS to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false statements;

- whether the prices of ELMS common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

99.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

100.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- ELMS securities met the requirements for listing, and were listed and actively traded on NASDAQ, an efficient market;

- As a public issuer, ELMS filed periodic public reports with the SEC and NASDAQ;

- ELMS regularly and publicly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

- ELMS was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

101.   Based on the foregoing, the market for ELMS common stock promptly digested current information regarding ELMS from all publicly available sources and reflected such information in the prices of ELMS common stock. Under these circumstances, all purchasers of ELMS common stock during the Class Period suffered similar injury through their purchase of ELMS common stock at artificially inflated prices and the presumption of reliance applies.

### COUNT I
### Violations of Section 10(b) and Rule 10b-5
### Against All Defendants

102.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

103.   This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

104.   During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order

to make the statements made, in light of the circumstances under which they were made, not misleading.

105.   Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

106.   Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of ELMS[13] were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or

---

[13] All references to ELMS henceforth include its predecessor, FIII.

documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of ELMS and/or ELM, their control over, and/or receipt and/or modification of ELMS' allegedly materially misleading statements, and/or their associations with ELMS and/or ELM which made them privy to confidential proprietary information concerning ELMS and/or ELM, participated in the fraudulent scheme alleged herein.

107.   Individual Defendants, who are or were senior executives and/or directors of ELMS and/or ELM at relevant times, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other ELMS personnel to members of the investing public, including Plaintiffs and the Class.

108.   As a result of the foregoing, the market price of ELMS common stock was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of ELMS common stock during the Class Period in purchasing ELMS common stock at prices that were artificially inflated as a result of Defendants' false and misleading statements.

109.   Had Plaintiffs and the other members of the Class been aware that the market price of ELMS common stock had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased ELMS common stock at the artificially inflated prices that they did, or at all.

110.   As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

111.   By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchase of ELMS common stock during the Class Period.

## COUNT II
### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

112.   Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

113.   During the Class Period, the Individual Defendants participated in the operation and management of ELMS, and conducted and participated, directly and indirectly, in the conduct of ELMS' business affairs. Because of their senior positions, they knew the adverse non-public information about ELMS' false financial results.

39

114.   As officers of a public business, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to ELMS' financial condition and results of operations, and to correct promptly any public statements issued by ELMS which had become materially false or misleading.

115.   Because of their positions of control and authority as senior executives and/or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which ELMS disseminated in the marketplace during the Class Period concerning ELMS' results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause ELMS to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of ELMS within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of ELMS common stock.

116.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the ELMS.

### COUNT III
### Violations of Section 14(a) of the Exchange Act and Rule 14a-9
### Against Defendants Kiev and Boris

117.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

118.   The claims set forth herein do not sound in fraud and are based on negligent conduct by Defendants Kiev and Boris.

119.   Defendants Kiev and Boris violated Section 14(a) of the Exchange Act and Rule 14a-9 thereunder in that these Defendants solicited proxies from Plaintiff Hacker and other members of the Class by means of a Proxy Statement that through Defendants' negligence contained statements which, at the time and in the light of the circumstances under which they were made, were false and misleading with respect to material facts, and omitted to state material facts necessary in order to make the statements therein not false or misleading.

120.   Plaintiff Hacker and other members of the Class were misled by Defendants Kiev's and Boris' false and misleading statements and omissions, were denied the opportunity to make an informed decision in voting on the Business Combination, and approved the Business Combination without having been advised of material facts. Accordingly, Plaintiff Hacker and other members of the Class did not receive their fair share of the value of the assets and business of the combined entity, suffered damages when ELMS' stock price decreased, and were prevented from benefitting from a value-maximizing transaction.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, pray for judgment and relief as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     awarding damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c)     awarding Plaintiffs and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     awarding Plaintiffs and other members of the Class such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

Dated: October 21, 2022             **THE ROSEN LAW FIRM, P.A**
                                    /s/ Laurence M. Rosen
                                    Laurence M. Rosen, Esq.
                                    One Gateway Center, Suite 2600
                                    Newark, NJ 07102
                                    Tel: (973) 313-1887
                                    Fax: (973) 833-0399
                                    Email: lrosen@rosenlegal.com

                                    Yu Shi (admitted *Pro Hac Vice*)
                                    275 Madison Ave, 40th Floor
                                    New York, NY 10016
                                    Tel: (212) 686-1060
                                    Fax: (212) 202-3827

Email: yshi@rosenlegal.com

*Lead Counsel for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 21st day of October 2022, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

_/s/_ Laurence M. Rosen