UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

SCOTT T. HACKER, et al.,
individually and on behalf of
all others similarly situated,

      *Plaintiffs,*

     v.

ELECTRIC LAST MILE SOLUTIONS
INC., et al.,

      *Defendants.*

Civil Action No. 22-545
(MEF)(LDW)


OPINION

I.    **Background**

    A.    **Allegations**

    B.    **The Lawsuit**

    C.    **The Motion for Preliminary Approval**

    D.    **Legal Principles That Govern the Motion**

    E.    **The Court's Approach to the Motion**

II.  **Information Before the Court**

    A.    **Law**

    B.    **Analysis**

III. **Likely to Certify**

    A.    **Numerosity**

    B.    **Commonality**

    C.    **Typicality**

    D.    **Adequacy**

    E.    **Predominance**

        1.  **Reliance**

 2. Other Elements
F. Superiority
IV. Likely to Approve
A. Law
B. The Key Issue
C. Risk of Establishing Liability
V. Likely to Certify/Likely to Approve
A. Law
B. Analysis
 1. Notice
 2. Claims-Processing
 3. Incentives
VI. Conclusion

\*　　\*　　\*

Two companies merged. The merged company disclosed accounting issues, and its stock price fell.

On behalf of a putative class, investors sued certain individual defendants.

The investors and the defendants reached a settlement, and the investors have now moved for preliminary approval of the settlement.

The motion is likely to be granted, and this Opinion explains why.

\*　　\*　　\*

I.   **Background**

A.   **Allegations**

A public acquiring company[1] and a private operating company[2] agreed to merge.  See Complaint[3] ¶ 38.  The proposed merger was approved during 2021 by a vote of the acquiring company's shareholders.  See id. at ¶ 39.  The shareholders voted, in part, based on the private company's year-end 2020 financial statements ("2020 Financial Statements") that were included in the proxy statement the shareholders received.[4]  See id. at ¶ 12.

The newly-combined company then submitted a registration statement to regulators.  See id. at ¶¶ 61-62.  The registration statement included the 2020 Financial Statements.  See id. at ¶¶ 12, 61.  It was signed by various people.  See id. at ¶ 62.

In 2022, the merged company announced that the 2020 Financial Statements would need to be restated because of accounting errors.  See id. at ¶ 66.

What were the errors?  In the months before the merger, the private company had issued shares for the benefit of certain senior employees.  These shares, it was announced in 2022, had not been properly accounted for.  See id. at ¶¶ 66-67.  As a result, the 2020 Financial Statements were themselves not proper from an accounting perspective.  See id.

The day after the announcement, the merged company's share price fell by about half.  See id. at ¶ 68.

---

[1]   Forum Merger III Corporation.

[2]   Electric Last Mile, Inc.

[3]   References to the "Complaint" are to the current operative complaint.

[4]   The 2020 Financial Statements were audited by an outside accounting firm.  The accounting firm was BDO USA, LLP.  The firm issued a "clean" opinion.  See Complaint ¶ 76.  A "clean" opinion is "the highest level of assurance that an auditor can give on an organization's financial statements."  In re Ikon Off. Sols., Inc., 277 F.3d 658, 663 n.4 (3d Cir. 2002).

**B.    The Lawsuit**

The Plaintiffs[5] sued (a) the outside accounting firm[6] that audited the 2020 Financial Statements, and (b) five individual defendants.[7]

The Plaintiffs and the accounting firm are not proposing to settle.  Therefore, the Plaintiffs' claims against the firm are generally not relevant here.

The Plaintiffs and the five individual defendants are proposing to settle.  That proposed settlement is the subject of this Opinion.

The five individual defendants are referred to from here as "the Defendants."

Three of the Defendants[8] were senior employees of the private company before the merger.  It was for the benefit of two of these Defendants[9] that the private company issued shares in 2020. (And it was improper accounting for this share issuance that eventually triggered the need to restate the 2020 Financial Statements.)

Four of the Defendants[10] signed the registration statement that attached the 2020 Financial Statements.

---

[5]   The Plaintiffs are investors.  They are seeking to represent a class, the scope of which is discussed below in Part III.

[6]   The case against the firm, see footnote 4, is the subject of the Court's opinion in Hacker v. Elec. Last Mile Sols. Inc., 2023 WL 5266357, --- F.Supp.3d ---- (D.N.J. Aug. 15, 2023).

[7]   James Taylor, Jason Luo, Albert Li, Marshall Kiev, and David Boris.

[8]   James Taylor and Jason Luo, plus Albert Li.

[9]   James Taylor and Jason Luo.

[10]   James Taylor and Jason Luo, plus Albert Li and David Boris. There are virtually no allegations as to one of the five Defendants, Marshall Kiev.

The Plaintiffs' lawsuit cites Section 10 of the Securities and Exchange Act of 1934, and Rule 10b-5 promulgated under the Act.[11] It claims the Defendants violated the law by making a material misrepresentation in the 2021 registration statement.  See generally Herman & MacLean v. Huddleston, 459 U.S. 375, 379 (1983) (affirming jury verdict finding violations of Section 10(b) and Rule 10b-5 where defendants made material misrepresentations in registration statement).

### C.   The Motion for Preliminary Approval

As noted, the Plaintiffs and the Defendants have reached a proposed settlement of the lawsuit.

The Plaintiffs have moved for preliminary approval of the settlement, as required by Federal Rule of Civil Procedure 23.

The motion became fully submitted earlier today.  That is when the last filing in support of the motion was made.

The motion is now before the Court.

### D.   Legal Principles That Govern the Motion

Under Federal Rule of Civil Procedure 23(e), claims of a "[proposed settlement class] . . . may be settled . . . only with the court's approval."  Fed. R. Civ. P. 23(e).

To grant such approval, the Court gathers information at a fairness hearing, see Fed. R. Civ. P. 23(e)(2), and then makes a final decision as to two questions.  First, whether to certify the proposed class.  See Fed. R. Civ. P. 23(e)(1)(B)(i).  And second, whether to approve the settlement.  See Fed. R. Civ. P. 23(e)(1)(B)(ii).

But that is at the end of the road.  This case is, now, at an earlier stage.[12]

---

[11]  The Complaint also asserts "control person" liability against the Defendants under Section 20(a).  This claim does not change the analysis.

[12]  This case is at the "preliminary approval" stage.  See Advisory Committee Notes, 2018 Amendments, Subdivision (c)(2) (using this term); 4 Newberg and Rubenstein on Class Actions § 13:10-11 (6th ed. 2023) (same).

At this point, the Court is required only to decide whether to allow the parties to notify the proposed class members of the terms of the proposed settlement. See Fed. R. Civ. P. 23(e)(1).[13]

To make that decision, the Court answers the following two questions. First, is the Court "likely [to] be able to" certify the proposed class? See Fed. R. Civ. P. 23(e)(1)(B)(ii). And second, is the Court "likely [to] be able to" approve the terms of the proposed settlement? See Fed. R. Civ. P. 23(e)(1)(B)(i).[14]

If the answers to these questions are yes and yes, then notice can go forward.

### E.    The Court's Approach to the Motion

At the outset, the Court considers whether it has before it the sort of information needed to decide the motion. The Court's answer: yes. See Part II.

The Court then considers whether the proposed class is "likely" to be certified. The Court's conclusion: yes, see Part III, but with a caveat taken up in Part V.

Next, the Court determines whether the proposed settlement agreement is "likely" to be approved. The Court's conclusion: again, yes, see Part IV, though again with the same caveat.

In Part V, the Court considers a question that partakes of both "likely" to certify and "likely" to approve aspects. As to this question, the Court will require some further information before reaching its decision. See Part V.

## II.  Information Before the Court

### A.    Law

At the preliminary approval stage, the Court must determine whether it is "likely [to] be able to" certify the proposed

---

[13] Once notified, proposed class members may weigh in at the fairness hearing, to the extent they want to.

[14] These two "likely" questions are essentially tentative versions of the two questions the Court would have to answer at the fairness hearing.

class, see Fed. R. Civ. P. 23(e)(1)(B)(ii), and whether it is "likely [to] be able to" approve the terms of the proposed settlement. See Fed. R. Civ. P. 23(e)(1)(B)(i).

To make these decisions, what information should the Court look to?

This question can loom large in a case like this one, where settlement is proposed before discovery is underway. There are, for example, no deposition transcripts to look to, and no interrogatory responses. Expert reports may be proffered, as they have been in this case. But the experts have not been cross-examined.

Here, the parties have repeatedly invited the Court to rely on extensive factual assertions contained only in legal briefs or lawyers' letters. Indeed, the Plaintiffs initially sought preliminary approval wholly on that basis. See Memorandum of Law in Support of Plaintiffs' Motion for Entry of Order Preliminarily Approving Settlement and Authorizing Dissemination of Notice of Settlement (June 28, 2023). And the Defendants recently proffered critical facts in unsworn lawyers' letters. See Gregory F. Laufer Letter (Jan. 19, 2024); Michael Doluisio Letter (Jan. 19, 2024); Joseph Matteo Letter (Jan. 19, 2024); Marlon Primes Letter (Jan. 19, 2024).

But that is not enough.

To see why, step back for a moment. In general, the people who are most strongly incentivized to correct a factually-erroneous assertion in a legal filing are those who have some sort of stake in the underlying dispute --- and who are opposed to the bottom-line position advanced by the party that made the filing.

But no one like that has appeared here. The Plaintiffs and the Defendants are the parties before the Court. But they both support the proposed settlement.

Is there anyone else who can be expected to step in to correct a factual error they might spot?

The only possible candidates are those proposed class members who might ultimately oppose the settlement.

But at this preliminary stage, no proposed class members (other than the named plaintiffs) have appeared. Indeed, because notice has not yet issued, proposed class members may not even know about this litigation. Cf. In re Gen. Motors Corp. Pick-Up

Truck Fuel Tank Prod. Liab. Litig., 55 F.3d 768, 803 (3d Cir. 1995) ("courts lack . . . independently-derived information about the merits [of] . . . proposed settlements" until objectors provide comments in the run-up to a fairness hearing).

Moreover, and especially in securities cases such as this one, class members often "have an insufficient incentive to contest an unpalatable settlement agreement because the cost of contesting exceeds the objector's pro rata benefit." Bell Atl. Corp. v. Bolger, 2 F.3d 1313 n.15 (3d Cir. 1993). But if there is not enough "incentive" to contest an "unpalatable" settlement, then there is surely too little incentive to enter the fray to correct this or that factual error.

In short, it is not realistic to expect that proposed class members are watching these proceedings from off-stage, ready to jump in with a corrective court filing should a legal brief contain a factually-erroneous assertion. This means that the ballast supplied by the ordinary adversary back-and-forth is, for now, absent.

In light of this, the Court holds that at the Rule 23 preliminary approval stage, important factual assertions must generally be based on evidence, such as sworn affidavits, not just on statements in legal papers.[15]

This approach makes sense for the reasons set out above, and for three additional reasons, too.

First, this approach is consistent with the overarching principle that "statements in briefs of counsel are not part of the record and cannot serve as bases for adjudication." In re Strubbe, 347 F.2d 217, 218 (3d Cir. 1965); see also, e.g., In re Grand Jury Subpoena, 696 F. App'x 66, 71 (3d Cir. 2017).

Second, it squares with the Court's duty to protect the interests of absent members of the proposed class. See generally Ehrheart v. Verizon Wireless, 609 F.3d 590 (3d Cir. 2010) (describing that duty); In re AT & T Corp., 455 F.3d 160, 175 (3d Cir. 2006) (same). As noted above, absent class members

---

[15] Of course, the preliminary approval stage is no moment for a mini-trial. Cf. Newman v. Stein, 464 F.2d 689, 692 (2d Cir. 1972) (Friendly, C.J.). But there is no danger of that here. Requiring that key facts be propped up by affidavits is a long way from requiring a trial-like hearing.

cannot themselves be expected to protect the record at this
stage from erroneous factual assertions.  But it is their
interests that such assertions could impact.[16]

Third and finally, requiring evidence fits with the basic design
of the 2018 amendments to Rule 23.  Those amendments formally
established a "preliminary approval stage,"[17] at which the Court
is to kick the tires on any proposed class settlement, see Fed.
R. Civ. P. 23(b)(e)(1)(B), before notice goes out and "all the
momentum that a settlement agreement generates"[18] starts to
build.  At the preliminary approval stage, the Court is required
to peer ahead, and to ask whether it is "likely" to ultimately
approve the proposed settlement at the end-of-the-line fairness
hearing.  See id.

That sort of look-ahead analysis is facilitated by consideration
at the preliminary approval stage of roughly the same sort of
information that the Court will be looking to later, at the
fairness hearing.  If the question at time 1 is "what will the
Court 'likely' decide at time 2?" --- then it makes sense at
time 1 to generally be looking at what will be on offer at time
2.

That point is reflected in the Advisory Committee Notes to the
2018 amendments to Rule 23.  See Advisory Committee Notes, 2018
Amendments, Subdivision (e)(1) (at the preliminary approval
stage, "the proponents of the settlement should ordinarily

---

[16]   In a related vein, note that there can be an imperfect
alignment of interests between class lawyers (who might seek to
proffer facts about various claims) and the proposed class
(whose claims are the ones in play).  See generally Saylor v.
Lindsley, 456 F.2d 896, 900 (2d Cir. 1972) (Friendly, C.J.).
One consequence of this is that lawyers may sometimes prefer
certain settlements more than their clients do.  See, e.g., Gen.
Motors, 55 F.3d at 802; see also In re Prudential Insurance
Company, 148 F.3d 283, 333 (3d Cir. 1998); Bell Atl. Corp., 2
F.3d at 1309.  And this disjunct is potentially another reason
not to rely on lawyers alone to put forward critical settlement
facts, without sworn evidence.

[17]   See footnote 12.

[18]   Mars Steel Corp. v. Cont'l Illinois Nat. Bank & Tr. Co. of
Chicago, 834 F.2d 677, 680 (7th Cir. 1987) (Posner, J.).

provide the court with all available materials they intend to submit to support approval under Rule 23(e)(2) and that they intend to make available to class members").[19]

And that point is telling here, because at the fairness hearing it is through sworn evidence --- not assertions in legal briefs --- that the critical facts are often proved up.  See, e.g., 4 Newberg and Rubenstein on Class Actions § 13:42 (6th ed.) (noting that at the fairness hearing "[t]he parties to the settlement agreement . . . bear the burden of submitting sufficient information for the court to evaluate the settlement," and "[t]he parties may do so by presenting witnesses, experts, and affidavits or declarations") (cleaned up).

In sum, the Court holds that at the preliminary approval stage, important factual assertions must generally be based on evidence, not solely on statements in legal briefs.

B.    **Analysis**

Does the Court here have enough evidence to go on?  In short: yes.

The Court has sworn declarations from four of the Defendants, who are key witnesses.  See Declaration of James Taylor (Jan. 26, 2024) ("Taylor Decl."); Declaration of David Boris (Jan. 29, 2024) ("Boris Decl."); Declaration of Albert Li (Jan. 29, 2024) ("Li Decl."); Declaration of Jason Luo (Jan. 29, 2024) ("Luo Decl.").  And the Court has sworn materials from the Plaintiffs' proposed claims administrator, see Declaration of Paul Mulholland (Nov. 3, 2023) ("Mulholland Decl."), and also as to the market in which shares of the relevant company traded.  See Declaration of Yu Shi (Feb. 28, 2024) ("Shi Decl.").[20]

---

[19]  The Supreme Court has routinely relied on advisory notes in construing the Federal Rules of Civil Procedure.  Some recent examples: Hall v. Hall, 584 U.S. 59, 75 (2018); Class v. United States, 583 U.S. 174, 184 (2018); United States v. Vonn, 535 U.S. 55, 64 n.6 (2002).

[20]  After suggestions from the Court, see Order (Oct. 19, 2023) and Order (Jan. 23, 2024), some of the factual assertions that had been made in legal briefs and lawyers' letters became sworn

These evidentiary materials provide a sufficient basis for the Court to analyze the key questions here.

### III. **Likely to Certify**

The first question, as noted, is whether the Court will "likely" be able to "certify the class for purposes of judgment on the proposal." Fed. R. Civ. P. 23(e)(1)(B)(ii).

To answer this question, the Court "review[s] application of the class certification standards and reach[es] a tentative conclusion that it will be able to certify the class in conjunction with final approval of the settlement." 4 Newberg and Rubenstein on Class Actions § 13:18 (6th ed. 2023).

The relevant class certification standards are set out in Federal Rules of Civil Procedure 23(a) and 23(b). See In re Pet Food Prod. Liab. Litig., 629 F.3d 333, 341 (3d Cir. 2010).

Rule 23(a)'s standards: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy.[21]

And the standard under the relevant part of Rule 23(b): that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).[22]

Take in turn these Rule 23(a) and Rule 23(b) standards.

---

statements in declarations. See, e.g., Laurence M. Rosen Declaration (Oct. 20, 2023); Luo Decl.

[21] A class may be certified "only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).

[22] Litigants choose which part of Rule 23(b) to satisfy. The Plaintiffs here have picked Rule 23(b)(3). See Laurence M. Rosen Declaration (Dec. 15, 2023) ("Rosen Dec. Decl."), Exhibit 3 (Dec. 15, 2023) ("Revised Proposed Order") ¶ 2.

A.   **Numerosity**

Start with numerosity.

The putative class members are investors who bought the public company's stock during a certain period of time.[23]  See Revised Proposed Order ¶ 2.

The Plaintiffs' expert has estimated that includes 16,509 class members.  See Mulholland Decl. ¶ 4.

That is more than enough to clear the numerosity hurdle.  See Stewart v. Abraham, 275 F.3d 220, 226–27 (3d Cir. 2001) ("No minimum number of plaintiffs is required . . . , but generally if . . . the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met."); see also, e.g., In re Schering Plough Corp. ERISA Litig., 589 F.3d 585, 596 (3d Cir. 2009) (requirement met when there were over 10,000 investor-claimants); cf. Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 182 (3d Cir. 2001) (requirement met when there were "hundreds of thousands" of investor-claimants), as amended (Oct. 16, 2001).

B.   **Commonality**

Now take commonality.

This requirement is "satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class."  In re Schering Plough, 589 F.3d at 597 (cleaned up).

Here, the Plaintiffs set out a number of purportedly common questions.  See Memorandum of Law in Support of Plaintiffs'

_____

[23]  The proposed class definition is more built-out than that. For example, under the class definition the investors also need to have suffered compensable damages.  See Second Amended Stipulation of Settlement (Mar. 20, 2024) ("Settlement") ¶ 1.30. This excludes investors who bought shares, but then sold them before it was announced that the 2020 Financial Statements needed to be restated.  Such investors could not have been damaged by the drop in the stock price after the announcement, because they had sold their shares by then.  The more-granular aspects of the class definition, some of which are alluded to in this footnote, are not relevant here.

Renewed Motion for Entry of Order Preliminarily Approving
Settlement and Authorizing Dissemination of Notice of Settlement
("Plaintiffs' Memo.") (Aug. 9, 2023) at 17; Complaint ¶ 98.

Any number of them fit the bill.

One of the Plaintiffs' proposed common questions: "whether . . .
[the 2020] [F]inancial [S]tatements violated GAAP." Plaintiffs'
Memo. at 17. That passes muster. See, e.g., In re IMAX Sec.
Litig., 272 F.R.D. 138, 146 (S.D.N.Y. 2010) (whether financial
statements complied with GAAP was a "common question" for Rule
23 purposes); In re Seitel, Inc. Sec. Litig., 245 F.R.D. 263,
270 (S.D. Tex. 2007) (same).

Another one of the Plaintiffs' proposed common questions:
"whether [the] Defendants acted with scienter." Plaintiffs'
Memo. at 17. That is also a sufficiently "common" question.
See, e.g., In re Schering-Plough Corp./ENHANCE Sec. Litig., 2012
WL 4482032, at *4 (D.N.J. Sept. 25, 2012) (defendants' scienter
was a "common question" for Rule 23 purposes); In re Honeywell
Intl Inc. Sec. Litig., 211 F.R.D. 255, 260 (D.N.J. 2002) (same).

## C.   Typicality

Consider typicality next.

The typicality requirement zeroes in on whether "the named
plaintiffs' individual circumstances are markedly different or
. . . the legal theory upon which the [named plaintiffs'] claims
are based differs from . . . the claims of other class
members[.]" Newton, 259 F.3d at 183 (cleaned up).

Here, there is no daylight between the named Plaintiffs' claims
and those of the proposed class members.

They all rest on the same factual underpinning. In particular:
investors buying stock at prices that did not reflect that the
2020 Financial Statements were based on flawed accounting. See
Complaint ¶¶ 11-12, 62, 96; see generally Part I.A.

And the claims all rest on the same legal theory. In
particular: that four of the Defendants knowingly made material
misrepresentations in the registration statement that included
the 2020 Financial Statements. See Complaint ¶¶ 96, 102-11; see
generally Part I.A.

Bottom line: there is complete factual and legal overlap between the named Plaintiffs' claims and the claims of the proposed class.

The typicality test is satisfied. See, e.g., Johnston v. HBO Film Mgmt., Inc., 265 F.3d 178, 185 (3d Cir. 2001) ("because the claims of the plaintiffs and the putative class members all arise from the alleged misrepresentations by the defendants, the claims of the plaintiffs are typical of those of the class"); Newton, 259 F.3d at 185 ("[i]f the claims of the named plaintiffs and putative class members involve the same conduct by the defendant, typicality is established"; see also Hoxworth v. Blinder, Robinson & Co., 980 F.2d 912, 923 (3d Cir. 1992) abrogated on other grounds by White v. Samsung Elecs. Am., Inc., 61 F.4th 334 (3d Cir. 2023).

### D.   Adequacy

The next test: adequacy.

This requirement comes down to two things.

First, are "the named plaintiffs' interests . . . sufficiently aligned with the absentees"? In re Cmty. Bank of N. Virginia, 418 F.3d 277, 303 (3d Cir. 2005) (cleaned up).

Here, yes.  There is no apparent conflict of interest between the named Plaintiffs and the other class members. See Plaintiffs' Memo. at 18-19.  For example, there does not seem to be a distinct set of defenses that could be pressed as to the named Plaintiffs, but not as to the other class members. Cf. Cmty. Bank, 418 F.3d at 307 (discussing a potential conflict where the named plaintiffs were subject to a statute of limitations defense, but other proposed class members were not).

The second part of the adequacy test hones in on class counsel, and whether they are "qualifi[ed]" to represent the class.  See id. at 303.

They are.  The Plaintiffs' lawyers are deeply experienced in this type of litigation, see Plaintiffs' Memo. at 19-20, and over the course of this case they have generally shown themselves to be both knowledgeable and diligent. Compare Order (Oct. 31, 2024) (seeking information), with Laurence M. Rosen Declaration (Nov. 3, 2023) (providing it).

### E.   **Predominance**

Now look to predominance.

The predominance requirement is met if "[i]ssues common to the class . . . predominate over individual issues." In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 311 (3d Cir. 2008), as amended (Jan. 16, 2009).   They generally do if the issues in play would be proved though evidence that is "common to the class rather than individual to its members." Id. at 311-12. To determine this, the Court asks whether "proof of the essential elements of the cause of action requires individual treatment." Id. at 311 (cleaned up).

The cause of action here is Section 10(b) of the Securities Exchange Act of 1934 as fleshed out by a regulation, Rule 10b-5. See Complaint ¶¶ 102-11.   The "essential elements" of a 10b-5 claim: (1) a material misrepresentation (or omission); (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.   See Malack v. BDO Seidman, LLP, 617 F.3d 743, 746 (3d Cir. 2010).

Will proof of these elements "predomina[ntly]," In re Hydrogen Peroxide, 552 F.3d at 311, turn on across-the-board evidence that is common to the class?

The Court's answer: yes.

To see why, start with reliance, the fourth of the six above-listed elements of a 10b-5 claim.   Cf. Erica P. John Fund, Inc. v. Halliburton Co., 563 U.S. 804, 810 (2011) ("whether common questions of law or fact predominate in a securities fraud action often turns on the element of reliance").

### 1.   **Reliance**

Reliance in this context is typically established by a "fraud-on-the-market theory." Halliburton, 563 U.S. at 810-11 (citing Basic Inc. v. Levinson, 485 U.S. 224 (1988)).

Under that theory, "[r]eliance may be presumed when a fraudulent misrepresentation or omission impairs the value of a security traded in an efficient market." Newton, 259 F.3d at 175; see generally Eugene F. Fama, Efficient Capital Markets: A Review of Theory and Empirical Work, 25 J. Fin. 383 (1970).

15

To trigger the referenced reliance presumption, plaintiffs must typically show four things: "(1) that the alleged misrepresentation was publicly known; (2) that it was material; (3) that the stock traded in an efficient market; and (4) that the plaintiff traded the stock between the time the misrepresentation was made and when the truth was revealed." Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys., 594 U.S. 113, 118 (2021) (citing Halliburton, 563 U.S. at 811).

The second part of the test (materiality) can be put to the side for now.  See Amgen Inc. v. Connecticut Ret. Plans & Trust Funds, 568 U.S. 455, 466-68 (2013) (so holding).

As to what remains, the first and fourth boxes are plainly checked.

As to the first, the alleged misrepresentations were public. They were made in the registration statement, which included the 2020 Financial Statements.  See Complaint ¶ 12.

As to the fourth, "the [P]laintiff[s] traded the stock between the time the misrepresentation was made and when the truth was revealed," Goldman Sachs, 594 U.S. at 118, because the proposed class definition, see Complaint ¶ 94, limits class members to those who bought stock between June 9, 2021 (the date of the first alleged misrepresentation, see id. at ¶ 12) and February 1, 2022 (the date it was announced the 2020 Financial Statements would need to be restated, see id. at ¶ 13).

This leaves the last remaining part of the test, whether the shares in question traded on an efficient market.  See Goldman Sachs, 594 U.S. at 118.

Yes, the Plaintiffs contend, and they offer two reasons why.

First, the shares were traded on the NASDAQ.  "[T]he listing of a security on a major exchange such as . . . the NASDAQ weighs in favor of a finding of market efficiency."  In re DVI, Inc. Sec. Litig., 639 F.3d 623, 634 (3d Cir. 2011), abrogated on other grounds by Amgen, 568 U.S. at 462-63.

Second, the Plaintiffs argue that the five factors set out in
Cammer v. Bloom, 711 F. Supp. 1264, 1285 (D.N.J. 1989),[24] suggest
the relevant market is efficient.[25]

Take these one at a time.

The first Cammer factor is a large-enough weekly trading volume
in the stock in question.  See id. at 1286.  Here, the weekly
trading volume amounted to 6.89% of the public company's
"float."[26]  See Laurence Rosen Letter (Feb. 28, 2024) ("Rosen
Letter") at 1.  That is enough.  See Cammer, 711 F. Supp at 1286
(suggesting 2% weekly turnover of outstanding shares may well
"justify a strong presumption that the market for the security
is an efficient one"); see also, e.g., Pope v. Navient Corp.,
2021 WL 926611, at *9 (D.N.J. Mar. 11, 2021) (5.45% weekly
trading volume leans in favor of "efficient market" conclusion).

Moreover, in absolute terms the weekly volume of shares being
traded during the relevant period was well over 1 million, and
often many times that.  See Shi Decl., Exhibit 1.  This, too, is
enough.  See Hayes v. Gross, 982 F.2d 104, 107 (3d Cir. 1992)

---

[24]  For purposes of this Opinion, the Court assumes these five
factors are the ones to look to.

[25]  Four of the five Cammer factors are focused on establishing
that there is ample and smooth buying and selling of a stock,
and that there are enough eyes on it.  These background
conditions tend to support an inference that new and material
public information can be quickly reflected in the stock's
price.  See generally, e.g., Qi Chen et al., Price
Informativeness and Investment Sensitivity to Stock Price, Rev.
Fin. Stud. 619 (2007); Joseph D. Piotroski, The Influence of
Analysts, Institutional Investors, and Insiders on the
Incorporation of Market, Industry, and Firm-Specific Information
into Stock Prices, 79 The Accounting Rev. 1119 (2004).  The last
of the Cammer factors is focused on more directly establishing,
often through an event study, that new and material public
information is quickly reflected in the stock's price.  (An
event study is a regression analysis that aims to isolate the
impact of one event, like the release of certain information, on
another event, like a stock price.)

[26]  That is: 6.89% of those of the company's shares that were
available to trade.

(sufficient allegations of an efficient market where weekly
trading volume was 38,000 shares).

The second Cammer factor is whether enough analysts followed and
reported on the stock during the class period.  See Cammer, 711
F. Supp at 1286.  Here, the Plaintiffs' evidence is that six
analysts followed the company, and disseminated reports about
it.  See Rosen Letter at 2.  Again, that is enough.  See Hayes,
982 F.2d at 107 (legally sufficient allegations of an efficient
market where five analysts followed the stock in question).

The third Cammer factor is whether there were enough market
makers[27] to ensure the market is as deep and liquid as it needs
to be.  See Cammer, 711 F. Supp at 1286-87.  Here, the
Plaintiffs' evidence is of 48 market-making firms during the
class period.  See Rosen Letter at 2.  That is plenty.  See In
re Res. Am. Sec. Litig., 202 F.R.D. 177, 189 (E.D. Pa. 2001) (33
market makers: enough).

The fourth Cammer factor is whether the company's market value
was such that it would have been entitled to file an S-3
registration statement.  See Cammer, 711 F. Supp at 1287.  That
test is met.  The Plaintiffs' evidence is that the relevant
company's market value was many times the S-3 threshold.    See
Rosen Letter (explaining the public company's market value
during the class period was over $300 million, well above the
floor for filing an S-3 registration statement).

The fifth and final Cammer factor: is there an indication that,
in fact, new and material public information tended to be
quickly reflected in the price of the relevant stock?  See
Cammer, 711 F. Supp at 1287.  The answer: yes, according to a
persuasive event study analysis put forward by the Plaintiffs.
See Rosen Letter 2; Shi Decl., Exhibit 4.

In sum: the stock in question traded on the NASDAQ and all five
Cammer factors point in the same direction.  Accordingly, the
reliance presumption is successfully invoked here, and "when the

---

[27]  A market maker is "a dealer who conducts a two-sided auction
for securities by standing ready to trade on either side of the
market for his or her own account when an order arrives."
Andrea Roncella, et al., The Ethics of Financial Market Making
and Its Implications for High-Frequency Trading, 181 J. Bus.
Ethics 139 (2022).

presumption of reliance is successfully invoked, the predominance requirement is met with respect to the element of reliance." In re DVI, 639 F.3d at 631, abrogated on other grounds by Amgen, 568 U.S. 455.

### 2.   Other Elements

Turn back now to the remaining five elements of the Plaintiffs' 10b-5 claim.   Looking at those, do common issues predominate? See generally In re Hydrogen Peroxide, 552 F.3d at 311.

They do.

Begin with materiality.   See Goldman Sachs, 594 U.S. at 118 (citing Halliburton, 563 U.S. at 811).   As is virtually always the case in Rule 10b-5 actions, this is a common issue.   It plays out in the same way across the board.   See Amgen, 568 U.S. at 467-68; see also Schleicher v. Wendt, 618 F.3d 679, 687 (7th Cir. 2010) ("[W]hether a statement is materially false is a question common to all class members[.]").

Next, consider the second element: whether the Defendants acted with the required mental state, scienter.   See generally Goldman Sachs, 594 U.S. at 118 (citing Halliburton, 563 U.S. at 811).

This is also a common issue.   It would almost surely be proved in largely the same way, using the same witnesses and documents, regardless of whether there is a single class-wide trial or thousands of smaller trials.   Why?   Because what the Defendants were thinking as they acted does not depend on who the plaintiffs in a particular case might or might not be.   See generally In re Intelligroup Sec. Litig., 527 F. Supp. 2d 262, 283 (D.N.J. 2007) ("scienter is based on the defendant's state of mind"); In re Honeywell, 211 F.R.D. at 260 (holding allegations of the defendants' scienter to be a common issue); Fisher v. Plessey Co. Ltd., 103 F.R.D. 150, 155 (S.D.N.Y. 1984) ("A 10b-5 action obviously raises questions of fact and law common to the claims of all potential class members, particularly with respect to the elements of materiality and scienter.").

The third element is whether there was a connection with the purchase or sale of a security.   The Plaintiffs "may establish the 'in connection with' element simply by showing that the misrepresentations in question were disseminated to the public in a medium upon which a reasonable investor would rely, and

that they were material when disseminated." Semerenko v. Cendant Corp., 223 F.3d 165, 176 (3d Cir. 2000).

This, too, is satisfied.  The misrepresentations at issue, in the 2020 Financial Statements, were included in a registration statement.  See Complaint ¶ 61.  It would be common evidence that is mustered to establish that audited financial statements are something that a "reasonable investor," Semerenko, 223 F.3d at 176, would be expected to rely on.  And so too with registration statements.  Across-the-board evidence, about how the markets work in general, would be proffered to show registration statements are "carefully wordsmithed to comply with the law," Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund, 575 U.S. 175, 188 (2015), and that because they are, "reasonable investors," Semerenko, 223 F.3d at 176, can be expected to pore over them.

For the next element, loss causation, "the plaintiff must show that the revelation of that misrepresentation or omission was a substantial factor in causing a decline in the security's price, thus creating an actual economic loss for the plaintiff." McCabe v. Ernst & Young, LLP., 494 F.3d 418, 425-26 (3d Cir. 2007).

This means showing that "intervening causes, such as changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events" were not the cause of the decline in the stock's price. Halliburton, 563 U.S. at 812-13.

And that is a matter of answering across-the-board questions about why a stock price in general moved as it did.  Such questions are all-but necessarily answered in a "common" way, not based on information that is particular to one plaintiff or another.

For the final element, economic loss, this largely turns on establishing how stock prices moved or did not move after the disclosure of the alleged misrepresentations.  Cf. Semerenko, 223 F.3d at 185.  This is, as with all of the others discussed above, an element as to which common issues will predominate.

## F.   Superiority

The last hurdle is superiority.  See Fed. R. Civ. P. 23(b)(3).

This is a matter of looking to the "balance, in terms of fairness and efficiency, [of] the merits of a class action against those of alternative available methods of adjudication." Cmty. Bank, 418 F.3d at 309 (cleaned up).

Here, the balance tilts sharply in the direction of a class action.

The aggregate loss here, at least for now, is estimated to be around $41 million. See Rosen Dec. Decl., Exhibit 1 (Damages Analysis). Assuming there are about 16,000 potential plaintiffs, as the Plaintiffs' expert calculates, see Mulholland Decl. ¶ 4., the per-plaintiff average loss is about $2500.

To calculate the expected recovery for each plaintiff, the per-plaintiff loss must be discounted by the likelihood that a given plaintiff who files a case will lose, and get nothing.

Here, that discount would be steep. There are real defenses available to the Defendants. (Of which more below. See Part IV.C.)

But even if the $2500 per-plaintiff figure is only discounted a small bit, say by 25%, few lawsuits would be brought. If the expected recovery is a bit below $2000 ($2500 discounted by 25%) finding a securities lawyer will be virtually impossible. There is too little money at stake to pay the lawyer's bills, to say nothing of the experts that are all-but necessary in these kinds of cases.

That means that most of the claims here are especially well-suited for class resolution, because otherwise they would likely not to be brought at all. See generally In re Baby Prods. Antitrust Litig., 708 F.3d 163, 179 (3d Cir. 2013) (describing "negative value claims" as "claims that could not be brought on an individual basis because the transaction costs of bringing an individual action exceed the potential relief").

*    *    *

In sum: the Court has analyzed each of the relevant Rule 23(a) and (b) factors, and determined that it is "likely" to be able to certify the class. (Though note: this conclusion is subject to a caveat taken up in Part V.B.I.)

## IV.   <u>Likely to Approve</u>

Beyond being "likely" to certify the class, <u>see</u> Part III, for notice to go out, a second question must also be asked: is the Court "likely [to] be able to" approve the terms of the proposed settlement?   <u>See</u> Fed. R. Civ. P. 23(e)(1)(B)(i).

The Court answers that question, briefly laying out the governing legal standards (Part IV.A), and quickly canvassing some of the less-critical factors here (Part IV.B).   The Court then focuses in on the key point --- whether, in light of the relevant defenses, the settlement provides enough money (Part IV.C).

### A.   <u>Law</u>

Is the Court likely to approve the proposed settlement?

The Third Circuit has set out various factors that together structure the Court's consideration of this question.   These are in <u>Girsh</u> v. <u>Jepson</u>, 521 F.2d 153 (3d Cir. 1975) and <u>Prudential</u>, 148 F.3d 283.

The <u>Girsh</u> factors:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

521 F.2d at 157 (cleaned up).

The <u>Prudential</u> factors:

22

> [1] the maturity of the underlying
> substantive issues, as measured by
> experience in adjudicating individual
> actions, the development of scientific
> knowledge, the extent of discovery on the
> merits, and other factors that bear on the
> ability to assess the probable outcome of a
> trial on the merits of liability and
> individual damages; [2] the existence and
> probable outcome of claims by other classes
> and subclasses; [3] the comparison between
> the results achieved by the settlement for
> individual class or subclass members and the
> results achieved — or likely to be achieved
> — for other claimants; [4] whether class or
> subclass members are accorded the right to
> opt out of the settlement; [5] whether any
> provisions for attorneys' fees are
> reasonable; and [6] whether the procedure
> for processing individual claims under the
> settlement is fair and reasonable.

148 F.3d at 323.[28]

---

[28]  Two things.

First, the Third Circuit's decision in Baby Products, 708 F.3d 163, includes an additional factor that a court must look to. See id. at 180.  It is not clear whether the additional Baby Products factor must be considered in common-fund proposed settlements of the kind at issue in this case.  This question need not be answered here.  As part of the referenced additional factor, Baby Products suggests consideration of "[1] the number of individual awards compared to both the number of claims and the estimated number of class members, [2] the size of the individual awards compared to claimants' estimated damages, and [3] the claims process used to determine individual awards." Id. at 174.  But regardless of whether Baby Factors applies here of its own force, these three considerations are taken up in this Opinion, at least to an extent.  Separate and apart from Baby Factors, per Rule 23 and Prudential, numbers [1] and [3] are considered here, in Part V.  And again separate and apart from Baby Factors, per Girsh, number [2] is considered here, in Part IV.

B.    **The Key Issue**

The Court has reviewed the governing factors, see Part III.A, in light of the evidence that has been put forward by the parties, see Part II.

The Court's conclusion: the proposed settlement is one that it is "likely" to approve, see Rule Fed. R. Civ. P. 23(e)(1), though subject to a caveat discussed in Part V.B.I.

In reaching this conclusion, the Court has put aside those factors that are not relevant yet. For example, the Court has not considered the "the reaction of the class to the settlement," Girsh, 521 F.2d at 157 (cleaned up), because notice to the class has not yet gone out. And the Court has not considered the attorneys' fees award, see Prudential, 148 F.3d at 323, because it has not yet been made.

In addition, the Court does not dwell on some of the factors, because they essentially speak for themselves. For example, securities cases of this sort are plainly expensive and complex, see Girsh, 521 F.2d at 157, and as to the "the amount of discovery completed," id., this case is in the pre-discovery stage.

In a similar vein, there is no need to linger on the "maturity of the underlying substantive issues." Prudential, 148 F.3d at

---

Second, separate from looking to Prudential and Girsh (and maybe Baby Products), courts in the Third Circuit "apply an initial presumption of fairness in reviewing a class settlement when: (1) the negotiations occurred at arms length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." In re Nat'l Football League Players Concussion Inj. Litig., 821 F.3d 410, 436 (3d Cir. 2016), as amended (May 2, 2016) (cleaned up). How this "initial presumption" might apply at the preliminary approval stage is not obvious. For example, because at the preliminary approval stage notice has not yet been made, there can be no systematic sense of how many objectors there are. How, then, does the Nat'l Football League test play out at the preliminary approval stage? The Court does not need to reach and resolve this question because the Court is "likely" to approve the proposed settlement, even without folding a presumption into the mix.

323.   Litigations of this kind, bottomed on alleged accounting errors, are familiar enough that the Court can make appropriate estimates as to how a trial might go.

Of the remaining factors, there is a straightforward answer as to one, "the ability of the defendants to withstand a greater judgment." See Girsh, 521 F.2d at 157.  Given what the Court has learned about relevant insurance coverage, see Declaration of Gregory F. Laufer (Dec. 15, 2023), and even taking into account other lawsuits, see Joint Letter (Oct. 11, 2023), it appears the Defendants could "withstand" a larger judgment than is envisioned by the proposed settlement.

What is left mainly comes down to one question.

The question: is the risk to the Plaintiffs that the Defendants would win at a trial large enough to justify the proposed settlement, which is $2.7 million on a roughly $41 million estimated aggregate loss?[29]

### C.   Risk of Establishing Liability

"[A] factor[] . . . relevant to a determination of the fairness of a settlement [is] . . . the risk[] of establishing liability." Girsh, 521 F.2d at 156-57.

In conducting this analysis, the Court should "survey the possible risks of litigation in order to balance the likelihood of success . . . if the case were taken to trial against the benefits of immediate settlement." Prudential, 148 F.3d at 319.

To do so, start by noting that one of the elements of the relevant cause of action is that, in signing the registration statement containing the 2020 Financial Statements, the signing Defendants acted with scienter. See Malack, 617 F.3d at 746. Scienter is "reckless or conscious behavior," Institutional Invs. Grp. v. Avaya, Inc., 564 F.3d 242, 276 (3d Cir. 2009) (cleaned up), and the theory would be that the Defendants behaved in a "reckless" or "conscious[ly]" wrongful way as to the 2020 Financial Statements --- which two years later would need to be restated because of an accounting error.

---

[29]  Addressing this question gets to the core issues implicated by the fourth, eighth, and ninth Girsh factors.  See Girsh, 521 F.2d at 157; Part IV.A.

On this theory, scienter would be a high and hard bar to clear.

First, the Defendants who signed the registration statement are not accountants. See Taylor Decl. ¶ 2; Boris Decl. ¶ 9; Li Decl. ¶ 4; Luo Decl. ¶ 4.

Second, the available evidence shows that they were not involved in preparing the erroneous 2020 Financial Statements. See Taylor Decl. ¶¶ 3–4; Boris Decl. ¶¶ 8–9; Luo Decl. ¶ 6; cf. Li ¶¶ 6–11.

Third, the Defendants have sworn that they relied on the "clean" opinion issued as to the 2020 Financial Statements by the outside auditor, a globally prominent accounting firm. See Taylor Decl. ¶ 5; Boris Decl. ¶¶ 2, 7, 10; Li Decl. ¶ 9; Luo Decl. ¶¶ 7–9. There is no reason in the current record to doubt this, and the Third Circuit has recognized "[g]ood faith reliance on the advice of an accountant . . . as a viable defense to scienter in securities fraud cases." S.E.C. v. Johnson, 174 F. App'x 111, 114–15 (3d Cir. 2006).

Fourth and finally, recall that the accounting error in the 2020 Financial Statements flowed from improper accounting for a 2020 stock issuance. Two of the Defendants were beneficiaries of the stock issuance, and senior executives at the company that made them. But these two Defendants have sworn that as to the stock issuance they relied on the advice of the accounting firm, as well as lawyers. See Luo Decl. ¶¶ 7–9; Taylor Decl. ¶ 5. There is, again, no reason in the evidence as it stands to doubt this.

All of this adds up to a strong defense. See generally, e.g., In re Lucent Techs., Inc., Sec. Litig., 307 F. Supp. 2d 633, 645 (D.N.J. 2004) ("The Plaintiffs . . . faced significant obstacles in establishing scienter. . . . [The] Defendants could point to the fact that [the company's] auditor had reviewed the . . . allegedly false and misleading financial statements."); In re Safety Components, Inc. Sec. Litig., 166 F. Supp. 2d 72, 89–90 (D.N.J. 2001) ("Plaintiffs likely would have had difficulty establishing the elements of a Rule 10b-5 violation . . . including the scienter element" where an accounting firm audited the financial statements); In re Ikon Off. Sols., Inc., Sec. Litig., 194 F.R.D. 166, 181–82 (E.D. Pa. 2000) ("[T]he settling defendants claim that they reasonably relied on [an auditor's] advice that [the company's] financial statements complied with [accounting standards] and were not deceptive, an argument that constitutes a strong defense.").

In short: if they went to trial, the Defendants would have a real likelihood of convincing the jury to return a "not liable" verdict.  That likelihood --- a large one --- needs to be used to steeply discount the total loss amount of $41 million and to generate a realistic bottom-line estimate of expected value. See generally Gen. Motors, 55 F.3d at 806 ("in cases primarily seeking monetary relief, the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing, should be compared with the amount of the proposed settlement") (cleaned up).

Such an estimate is what the proposed settlement here rests on, and while it does not hover all that far above "the lowest point in the zone of reasonableness," it does not "f[a]ll below." Newman, 464 F.2d at 698.  Accordingly, the proposed settlement is supported by the "risk[] of establishing liability" factor, see Girsh, 521 F.2d at 157, as well as by the various other factors that are largely linked to it on the facts of this case.[30]

## V.   <u>Likely to Certify/Likely to Approve</u>

A final issue relates to the manner in which, under the proposed settlement, class members: (a) are notified that they are potentially eligible for a pay-out, then (b) make claims, and then (c) are paid out, if their claims are valid.

In practice, this is a continuous out-and-back process.  Notice goes out, and claims come back in; claims are assessed, and then payments go out.

---

[30]   Those factors are noted in footnote 29 above.  Two further points.  First, the proposed settlement here is around 6.6% of the total loss amount.  See Plaintiffs' Memo. at 2.  This seems to place it toward the mid-point of recoveries in securities class action cases.  See generally In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 538–39 (3d Cir. 2004) (suggesting a range of 1.6% to 14%).  Second, note that there may potentially be a further recovery for the Plaintiffs here.  This is because the Plaintiffs' pending case against the outside auditor is at the motion to dismiss stage.  See generally Hacker, 2023 WL 5266357.

This process is therefore taken up here as a coherent whole.

But note that in evaluating this process, the doctrines the Court must look to are predicated on two slightly different sources of law.

As to the question of whether the going-out notice is sufficient, that is largely controlled by Rule 23's notice standards. It is therefore a matter of whether the Court is "likely to certify" the proposed class.

As to the question of whether the claims-assessment process is sufficient, that is largely controlled by the Third Circuit's Girsh/Prudential line of cases as to whether a settlement is appropriate. It is therefore a matter of whether the Court is "likely to approve" the proposed settlement.

In this section, the Court lays out the governing law, see Part V.A, and then explains in Parts V.B.1, V.B.2, and V.B.3 the three bases for its conclusion.

The conclusion: the Court is "likely" to determine that the overall notice-and-claims process meets the relevant standards.

### A.   Law

Take, first, the law that governs notice.

This is a proposed class under Federal Rule of Civil Procedure 23(b)(3). See footnote 21.

Under that Rule, notice must be "the best notice that is practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B).[31]

That is a matter of who, how, and what.

Who must be notified: "all members" of the proposed class "who can be identified through reasonable efforts." Id.

How they must be notified: by means of "one or more of the following: United States mail, electronic means, or other appropriate means[.]" Id.

---

[31]  This is a higher notice standard than is required as to other types of Rule 23 class actions. See generally Zimmer Paper Prod., Inc., 758 F.2d at 90.

What they must be told: "(i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members . . . " --- all "clearly and concisely state in plain, easily understood language." Id.[32]

After notices go out and claims come back, the claims must be assessed and appropriate pay-outs must be made to those who have valid claims.  To approve the proposed settlement, "the procedure for processing individual claims under the settlement" must be "fair and reasonable."  In re Prudential, 148 F.3d at 323.

    **B.**   **Analysis**

Is the Court "likely" to conclude that the notice and claims-processing requirements have been met?  See generally Fed. R. Civ. P. 23(e)(1)(B).

Yes, for three reasons (but with a caveat taken up in Part V.B.1 below).

---

[32]  The law as to notice is detailed and prescriptive, and it sets the bar high ("best").  Why is the law so demanding here?  To see one possible reason, start with a point of comparison.  If the Court preliminarily approves a settlement that promises, say, insufficient money, the fairness hearing provides a reasonable chance for error-correction.  Class members who seek a bigger settlement may come forward at the hearing, to try to persuade the Court with new information or arguments.  But if the Court preliminarily approves a settlement that affords insufficient notice, those sorts of errors cannot be readily corrected at the fairness hearing.  Class members who have not been reached by the preliminarily-approved notice will not share their dissatisfactions at the hearing.  Indeed, because of the deficient notice, they will likely not know about the hearing in the first place.  If a front-end error is made by the Court as to notice, there is much less back-end opportunity for error-correction.

### 1.   Notice

As to notice, the Plaintiffs propose to rely on an approach their lawyers have used in the past, in other class actions. See Mulholland Decl. ¶ 5 n.1.

The Court's conclusion: on its face, this approach meets the relevant standards.

To explain why, start with who would be reached by the proposed notice.

As an initial matter, the claims administrator has sworn that, in his judgment, "the vast majority of potential class members are expected to be beneficial purchasers whose securities are held in 'street name' --- i.e., the securities are purchased by brokerage firms, banks, institutions and other third-party nominees in the name of the nominee, on behalf of the beneficial purchasers." Id. at ¶ 5 n.1.

The names and contact information of these "beneficial purchasers" (the potential class members) are known only to the "nominees" (brokerage firms, etc.). Id.

Accordingly, the claims administrator intends to send the notice to a "continually update[d] . . . proprietary master list of approximately 2,200 brokerage firms, banks, institutions, and other third-party nominees." Id.

The notice will "notif[y] them of the settlement and request[] that they, within 10 calendar days from the date of the letter and/or email, either (a) send their customers who may be beneficial purchasers/owners notice of the settlement, or (b) provide [the claims administrator] with a list of the names, last known mailing addresses, and email addresses of such beneficial purchasers/owners so that [the claims administrator] could promptly send notice directly to them." Id.

This method, the Plaintiff indicates, will be doubly supplemented.

Additional class members will be "identified by publications in a national newswire and the Depository Trust Company through its Legal Notice System." Id.

And furthermore: the "defendants provided [the claims administrator] the transfer agent's list of any certificate holders," id., and they will be notified, too.

30

The approach sketched out above plainly meets the relevant standards.  Cf. Lachance v. Harrington, 965 F. Supp. 630, 636-37 (E.D. Pa. 1997) (holding this same basic approach satisfied the "best practicable" requirement).

Turn now to how members of the proposed class would receive notice.

The Plaintiffs' proposal is that (a) notice be published twice in a national newswire service, and (b) notice be sent two times by email where email addresses are available, or by first class mail where email addresses are not available.  See Revised Proposed Order ¶¶ 13-18.

These methods meet the delivery requirement of Rule 23(c)(2)(B). See Fed. R. Civ. P. 23(c)(2)(B) (requiring that class members be notified by means of "one or more of the following: United States mail, electronic means, or other appropriate means"); see also Gilbertson v. J. Givoo Consultants I, Inc., 2021 WL 689114, at *2 (D.N.J. Feb. 23, 2021) ("[T]he practice of permitting notice by USPS and additional electronic means, including email . . ., finds ample support in this district."); see also Zimmer Paper Prod., 758 F.2d at 91 ("[F]irst-class mail and publication regularly have been deemed adequate under . . . Rule 23(c)(2).").

Finally, consider what the proposed class members would be told.

Rule 23's requirements on this score are detailed.

The proposed class members must be alerted to "the nature of the action."  See Fed. R. Civ. P. 23(c)(2)(B)(i).  Under the proposed notice, they are.  See Settlement, Exhibit A-1 ("Proposed Long Notice") at 3.

Proposed class members must be given "the definition of the class certified[.]"  See Fed. R. Civ. P. 23(c)(2)(B)(ii).  Under the Plaintiffs' proposal, they are given that.  See Proposed Long Notice at 1.

The proposed class members must be made aware of "the class claims, issues, or defenses[.]"  See Fed. R. Civ. P. 23(c)(2)(B)(iii).  The notice proposed by the Plaintiffs covers that.  See Proposed Long Notice at 2-4.

The notice must indicate "that a class member may enter an appearance through an attorney if the member so desires[.]"  See

Fed. R. Civ. P. 23(c)(2)(B)(iv). The proposed notice makes that clear. See Proposed Long Notice at 10.

The proposed class members need to be told "that the court will exclude from the class any member who requests exclusion[.]" See Fed. R. Civ. P. 23(c)(2)(B)(v). The proposed notice says that. See Proposed Long Notice at 9-10.

"[T]he time and manner for requesting exclusion" must be spelled out in the proposed notice. See Fed. R. Civ. P. 23(c)(2)(B)(vi). It is. See Proposed Long Notice at 9-10.

And finally, "the binding effect of a class judgment on members" must be laid out for members of the proposed class. See Fed. R. Civ. P. 23(c)(2)(B)(vii). The proposed notice does this. See Proposed Long Notice at 2, 9-10, 12.

This is all as it should be, though the Court has two hesitations that the parties will be given an opportunity to address.

First, Rule 23 requires that notice must be "clearly and concisely state[d] in plain, easily understood language." See Fed. R. Civ. P. 23(c)(2)(B).

But the notice here could be more plain spoken. Cf. Easterday v. USPack Logistics LLC, 2023 WL 4398491, at *6 (D.N.J. July 6, 2023) (rejecting notice where language was unclear).

Second, the proposed notice envisions that those who may want to comment on the proposed settlement, or to opt-out of the class, must send a letter to the Court. See Proposed Long Notice at 10 ("You cannot exclude yourself by telephone or by e-mail"); 15 ("You can tell the Court you do not agree with the Settlement . . . by mailing a letter" to the Court and the parties' attorneys.).

But this creates an unnecessary barrier to entry, especially for individual investors. Stamps and envelopes are not quite as readily-at-hand as they once were. And mailing letters is more costly and time-consuming than, say, sending an email. Simpler electronic mechanisms for communicating should be made available to the proposed class. See Paredes Garcia v. Harborstone Credit Union, 2023 WL 4315117, at *3 (W.D. Wash. July 3, 2023) ("Class members may also object to the settlement via mail or email."); In re Uber FCRA Litig., 2017 WL 2806698, at *2 (N.D. Cal. June

29, 2017) ("Class members may submit claim forms, opt-out, or object by mail, email, or through the settlement website.").

## 2.   Claims-Processing

As to claims assessment, and the pay-out of valid claims, the plan, in a nutshell:

After notice has been made, see Revised Proposed Order ¶¶ 13-18, the claims administrator receives back proofs of claim mailed in on behalf of class members.  See id. at ¶ 21.  The administrator then evaluates the proofs to determine if they meet certain conditions.  See id.  Each proof of claim must:

> (i) be properly completed, signed and submitted in a timely manner in accordance with the provisions of the preceding subparagraph; (ii) it must be accompanied by adequate supporting documentation for the transactions reported therein, in the form of broker confirmation slips, broker account statements, an authorized statement from the broker containing the transactional information found in a broker confirmation slip, or such other documentation as is deemed adequate by the Claims Administrator or Lead Counsel; (iii) if the person executing the Proof of Claim is acting in a representative capacity, a certification of his current authority to act on behalf of the Settlement Class Member must be provided with the Proof of Claim; and (iv) the Proof of Claim must be complete and contain no material deletions or modifications of any of the printed matter contained therein and must be signed under penalty of perjury.

Id.

The administrator then determines if the proof of claim measures up to these standards.  See id.

If it is deficient or otherwise rejected, the claims administrator will send the claimant a letter saying so, and describing the basis for its determination.  See id.  Proposed class members are then given 10 days to cure the cited deficiency.  See id.  And the claims administrator will make at

least one attempt to contact class members by telephone, to offer assistance curing the deficiency.  See id.[33]

As to those class members with valid claims, they are paid out on a pro rata basis from the settlement fund, and in light of a formula set out in the "plan of allocation."  See Settlement ¶ 1.21; Proposed Long Notice at 5-8.

The claims-processing method described above is essentially "standard."  See, e.g., In re Ocean Power Techs., Inc., 2016 WL 6778218, at *24 (D.N.J. Nov. 15, 2016).  It meets the "fair and reasonable" test.  See In re Prudential, 148 F.3d at 323.

### 3.    Incentives

For the reasons set out above, the Court is "likely" to conclude that the proposed notice plan (Part V.B.1) and the proposed claims-processing plan (Part V.B.2) each pass muster.

The Court's conclusion is supported by one other reason, too.

That reason: the Plaintiffs' lawyers are, now, sufficiently incentivized as a financial matter to ensure that the notice-and-claims process ultimately works well in practice on behalf of the proposed class.

To see the point, step back for a moment.

Agents and principals can sometimes want different things.  This is a ubiquitous issue.  See, e.g., Michael C. Jensen and William H. Meckling, Theory of the Firm: Managerial Behavior, Agency Costs and Ownership Structure, 3 J. Fin. Econ. 305 (1976).  And it can impact the relationship between lawyers (who are agents) and their clients (who are principals), perhaps especially in the class action context.  See, e.g., Bell Atl. Corp., 2 F.3d at 1309.

One way to address this issue is by making use of financial incentives, which can yoke principals and agents more closely together, with any eye to ensuring they pull in the same direction.  An example of using incentives this way is a contingency fee arrangement, which has the lawyer earning a percentage of the total recovery obtained by the plaintiff.  Contingency fees encourage plaintiffs and their lawyers to each aim for the same thing, a large recovery for the plaintiff.

---

[33]  This may sometimes lead to disputes, and if they are not resolved, they are submitted to the Court.  See id.

See, e.g., Elizabeth Chamblee Burch, Procedural Adequacy, 88
Tex. L. Rev. 55, 61–62 (2010) (alluding to this point in the
class action context).

But in the context here, of a proposed settlement of a common-
fund class-action,[34] the conventional contingency fee model may
not provide all of the incentives it needs to.  A lawyer
expecting to earn 1/3 of any total recovery will want the
plaintiffs' recovery to be large.  If the recovery is $210,000,
the lawyer can hope to earn $70,000.  But under this 1/3
contingency fee structure, the lawyer gets paid the same $70,000
regardless of how the $140,000 ($210,000 minus $70,000) is
divvied up, whether 10 people split it (each gets $14,000) or
10,000 people do (each gets $14).

As a result of all this, the Plaintiff's lawyer will have an
affirmative financial incentive to push for a large top-line
number.  But the lawyer will have no specific financial
incentive to design and execute an effective notice and claims-
processing mechanism, of the sort that may well be the
difference between a low pay-out rate (10 class members
submitting valid claims) and a high pay-out rate (10,000 class
members putting in valid claims).[35]

---

[34]  A common-fund settlement is a settlement where "a defendant
contributes the settlement amount, say $100 million, into a
settlement fund; the fund is distributed to the class directly
or after a claims process."  4 Newberg and Rubenstein on Class
Actions § 13:7 (6th ed.).

[35]  Would the absence of such a financial incentive have a
practical impact?  Some would say "no."  They would emphasize,
among other things, (a) the duties that lawyers routinely and
faithfully discharge on behalf of their clients, and (b) that it
is the Court that must ultimately approve any class action
settlement.  Cf. Mars Steel Corp., 834 F.2d at 680 (Posner, J.)
(as to point (b)).  Others would say "yes."  They would
emphasize that without an affirmative incentive, some lawyers
might potentially prefer notice procedures that are less than
robust --- so that there are fewer claimants, each of whom gets
paid a bit more, and each of whom is therefore less likely to
object to the settlement at the fairness hearing.  The Court
expresses no views on all of this.  What might happen in the

Here, though, any gap in the lawyers' incentives has been closed. The Court has previously indicated that, as part of its ultimate decision as to the appropriate attorneys' fee award here, it will assess: (a) whether notice went out broadly enough, and (b) whether claims-processing was executed in an appropriate and effective manner. See Order (Oct. 31, 2023); Telephone Conference (Dec. 1, 2023).[36]

This provides an appropriately fine-grained incentive to the Plaintiffs' lawyers. Their fee will depend, in some part, on the Court's close analysis of how well the notice and claims process actually went in practice. Cf. In re Wawa, Inc. Data Sec. Litig., 85 F.4th 712, 725 (3d Cir. 2023) ("[W]e have recognize[d] the difficulty a district court faces in calculating attorney's fees before class relief is given out . . . . And while [delaying the fee award analysis] is not required by Rule 23, it seems a sensible starting line to begin the fee award analysis. So we remand for consideration of the amounts distributed to and expected to be claimed by the class.") (cleaned up); see also Baby Products, 708 F.3d at 178 (discussing the possibility of "delay[ing] a final assessment of the fee award . . . until the distribution process is complete") (cleaned up).[37]

---

absence of incentives is not relevant because incentives have now been put in place, as explained in the text.

[36] In response to the Court's suggestion, the parties submitted a revised proposed order. See Revised Proposed Order. That order, among other things, makes clear that calculation of attorneys' fee will take place after the notice and claims process has been completed and after appropriately detailed information about how it all went has been received by the Court. See id. at ¶ 31.

[37] The Court has not set any bright-line benchmarks as to how, for example, the bottom-line pay-out rate to class members will impact the fees for the class lawyers. This is, in part, because notice is not free. Not all steps that expand the reach of notice may be cost-justified. In the common-fund context, notice costs virtually always erode the overall recovery of the class to an extent. And they can sometimes do so without enough bang for the buck on the other side of the ledger. There is a balance to be struck here, of a kind that is not readily susceptible to bright-line rules.

That this incentive is in place is an added reason for the Court to confidently conclude that the proposed notice and claims process will be well and carefully executed.

## VI.   Conclusion

The Court is "likely" to certify the proposed class and to approve the proposed settlement.  This, though, is subject to the two matters discussed in Part V.B.1.  The parties will have an opportunity to address them, on a schedule to be established in an order that will issue today.


*  *  *

It is on this 21st day of March, 2024 **SO ORDERED**.

---

Michael E. Farbiarz, U.S.D.J.